141 P.3d 1259 (2006)
2006-NMSC-040
Samuel UPTON, Plaintiff-Petitioner,
v.
CLOVIS MUNICIPAL SCHOOL DISTRICT, Defendant-Respondent.
No. 29,226.
Supreme Court of New Mexico.
June 12, 2006.
Rehearing Denied August 30, 2006.
As Revised September 12, 2006.
Doeer & Knudson, P.A., Stephen E. Doerr, Portales, NM, for Petitioner.
Brown & German, Daniel J. Macke, Elizabeth L. German, Albuquerque, NM, for Respondent.
Michael B. Browde, Albuquerque, NM, MCCML, P.A., Randi McGinn, Albuquerque, NM, for Amicus Curiae New Mexico Trial Lawyers Association.
Miller Stratvert P.A., Joseph L. Romero, Scott P. Hatcher, Santa Fe, NM, for Amicus Curiae, New Mexico Self Insurers' Fund, New Mexico County Insurance Authority.

*1260 OPINION
BOSSON, Chief Justice.
{1} The Uptons' fourteen-year-old daughter, Sarah, died as a result of an asthma attack that occurred while she was at school. The attack began after a substitute physical education teacher required Sarah to participate in a higher level of exercise than normal, even after the school had been notified of her special medical needs. The effects of the attack may have been aggravated when school personnel failed to respond appropriately to her condition of acute distress. The Uptons claim that school personnel acted negligently, causing the death of their daughter, and that such negligence is actionable under the Tort Claims Act (TCA), NMSA 1978, §§ 41-4-1 to -29 (1976, as amended through 2004), being part of the "operation or maintenance" of a public building. See § 41-4-6. The district court was not persuaded and granted summary judgment for the school, which the Court of Appeals affirmed. See Upton v. Clovis Mun. Sch. Dist., 2005-NMCA-085, ¶ 1, 137 N.M. 779, 115 P.3d 795. We now reverse and remand for further proceedings.

BACKGROUND
{2} Sarah Upton suffered from asthma since the age of three. She learned to live with the disease, knowing when an attack began and how to treat it. Sarah's parents also took precautions regarding their daughter's special health needs. After finding out that Sarah, a ninth grader, would have to participate in a mandatory physical education class, Sarah's mother went to the school to talk with Sarah's physical education teacher regarding her asthmatic condition. The teacher was aware of Sarah's asthma and agreed that she could limit her participation if Sarah felt that the physical exercise was triggering an attack. Sarah's parents also noted her condition on her Individualized Education Plan (IEP), an agreement between parents of children with special needs and educators specifying certain educational goals and the special services their child would require. The Uptons also gave their consent so that school personnel could immediately contact medical personnel directly in the event of an attack.
{3} On the day of Sarah's death, a substitute teacher in charge of her physical education class required exercise that was more strenuous than normal. As a result, Sarah became uncomfortable, she began having difficulty breathing, and became red in the face. When Sarah asked the teacher for permission to stop, the teacher refused. She returned to the class crying, and struggled to continue with the exercise.
{4} After the physical education class, Sarah used her inhaler and went to her next class. Shortly after the class began, at 2:28 p.m., Sarah collapsed at her desk. At 2:29 p.m., her teacher called the front office for assistance and then attempted to administer two inhaler treatments. Another teacher arrived followed by the school secretary who had some nurse training. She checked Sarah's vital signs and asked the office to call 911. Sarah was then placed in a wheelchair and taken into the hallway. No one ever administered CPR or any other emergency protocol.
{5} In the hallway a police officer saw Sarah and called 911 immediately. There is evidence suggesting that his call, fifteen minutes after the onset of Sarah's attack, was the first actual contact with 911. The school also called 911 around this same time. When medical personnel finally arrived, Sarah was no longer breathing. Attempts to revive her were unsuccessful, and she died that afternoon from the asthma attack.
{6} The Uptons filed this wrongful death action against the Clovis Municipal School District (the "School District"), alleging various acts of negligence on the part of school employees that contributed to Sarah's death. In response to the School District's claim of tort immunity, the Uptons argued that Section 41-4-6 of the TCA waives tort immunity in this instance for the "negligence of public employees while acting within the scope of their duties in the operation or maintenance of [a public] building." Section 41-4-6. *1261 Both the district court and the Court of Appeals agreed with the School District, and we granted certiorari to explore whether the statutory waiver of immunity for negligent acts committed in the "operation or maintenance of any building" applies in this context.

DISCUSSION

Standard of Review
{7} A district court's grant of summary judgment is reviewed de novo, and is only appropriate "where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." Self v. United Parcel Serv., Inc., 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "[W]e view the facts in a light most favorable to the party opposing the motion [for summary judgment] and draw all reasonable inferences in support of a trial on the merits." Handmaker v. Henney, 1999-NMSC-043, ¶ 18, 128 N.M. 328, 992 P.2d 879. We also review the applicability of the TCA de novo. Godwin v. Mem'l Med. Ctr., 2001-NMCA-033, ¶ 23, 130 N.M. 434, 25 P.3d 273.

The Tort Claims Act Building Waiver Under Section 41-4-6
{8} The TCA was enacted after this Court rejected common law sovereign immunity in Hicks v. State, 88 N.M. 588, 544 P.2d 1153 (1975), superseded by statute as stated in Electro-Jet Tool Mfg. Co. v. City of Albuquerque, 114 N.M. 676, 845 P.2d 770 (1992). See §§ 41-4-1 to -29. The TCA grants all government entities and their employees general immunity from actions in tort, but waives that immunity in certain specified circumstances. See § 41-4-4. The waiver for "operation or maintenance of any building" is just such a circumstance. Section 41-4-6. The waiver allows individual claims against governmental entities that are based on "the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." Id. For the waiver to apply, the negligent "operation or maintenance" must create a dangerous condition that threatens the general public or a class of users of the building. See Espinoza v. Town of Taos, 120 N.M. 680, 683, 905 P.2d 718, 721 (1995) ("the critical question is whether the condition creates a potential risk to the general public"); Castillo v. County of Santa Fe, 107 N.M. 204, 207, 755 P.2d 48, 51 (1988) (holding the waiver applies because the condition threatened the residents of the public building and their invitees).
{9} Historically, the TCA waiver under Section 41-4-6 has been interpreted broadly to protect private citizens from the consequences of dangerous conditions created by the negligence of public employees in the "operation or maintenance" of public buildings. See Bober v. N.M. State Fair, 111 N.M. 644, 653, 808 P.2d 614, 623 (1991). The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building. See Castillo, 107 N.M. at 206-07, 755 P.2d at 50-51 (stating the county's failure to respond to a pack of dogs roaming a public housing facility created a dangerous condition to residents and their invitees, and fell under the waiver); Leithead v. City of Santa Fe, 1997-NMCA-041, ¶¶ 12, 15-16, 123 N.M. 353, 940 P.2d 459 (indicating failure by a public swimming pool to provide an adequate number of capable lifeguards created a dangerous condition arising out of the operation of the pool). The dangerous condition need not be limited to the confines of the building, but can include the grounds surrounding and linked to the structure. See Bober, 111 N.M. at 653, 808 P.2d at 623 (holding that the common grounds of the State Fairgrounds constitute a building under Section 41-4-6); Castillo, 107 N.M. at 206, 755 P.2d at 50 (stating dangerous condition in the public areas between the county housing structures fell within the waiver).

The School District's Negligence Created a Dangerous Condition for Sarah
{10} According to the Uptons' claim, the School District operated Sarah's school in a manner that put both her and other similarly *1262 situated students at risk. The Uptons assert that Sarah's death was caused by the School District's negligence during two periods of time: (1) the events occurring prior to and leading up to the asthma attack, and (2) the events occurring after the attack began. Prior to the asthma attack, Sarah's parents disclosed her condition to the school, both verbally and in writing, and received assurances that their daughter's special needs would be met. Then, the school allegedly failed to advise the substitute teacher of these special needs which created a dangerous condition for Sarah. The substitute teacher then made Sarah perform strenuous exercise that was inappropriate and unreasonable under the circumstances despite Sarah informing the teacher of her distress. In turn, these negligent actions and omissions led to the asthma attack and Sarah's death.
{11} In the second part of their claim, the Uptons challenge the School District's failure to respond to Sarah's attack. From the time Sarah's distress was first noticed, it took the school approximately fifteen minutes to call 911, adverse to the explicit instructions Sarah's parents had given the School District to contact emergency personnel immediately. To the contrary, a police officer at the school called 911 immediately upon seeing Sarah in the hallway. The school's limited response to Sarah's emergency was an attempt to give her an inhaler treatment, followed by a decision to place her into a wheelchair and push her out to the sidewalk. CPR was never administered even though, according to the allegations, it was clear from the onset of the attack that Sarah was not breathing well and was turning blue. Evidence indicates that Sarah may already have been dead when the ambulance arrived, suggesting that it should have been clear to school personnel that Sarah required immediate medical attention.
{12} This is not the first time our courts have been faced with a tort claim under Section 41-4-6 of the TCA, caused by negligent failure of public employees to follow appropriate safety procedures at a public building or park. In one such case, Leithead, a young girl nearly drowned at a public swimming pool and likely suffered brain injury, when an inadequate number of capable lifeguards were on duty. 1997-NMCA-041, ¶¶ 12, 15, 123 N.M. 353, 940 P.2d 459. Noting that lifeguard services are essential to swimming pool safety, our Court of Appeals held that negligent implementation of safety protocols created a dangerous condition arising from the "operation" of the facility within the meaning of Section 41-4-6. Id. ¶¶ 3, 12-15 (relying on this Court's prior opinion in Seal v. Carlsbad Indep. Sch. Dist., 116 N.M. 101, 104-05, 860 P.2d 743, 746-47 (1993), which held that a school district could be sued for negligence in the operation or maintenance of a swimming pool for not ensuring that lifeguards were "present and acting as such").
{13} Similar to Leithead, the School District's alleged failure to follow procedures established for at-risk students appears to fall comfortably within the Section 41-4-6 waiver for "operation or maintenance" of a public building. Just as schools generally have safety procedures in place for various kinds of emergencies, a school simply cannot operate in a safe, reasonable, and prudent manner without affording, at the very least, the health and safety services that students have been promised, and upon which parents have relied. Safety procedures are particularly vital for those students known to have special needs and special risks. In this instance, the School District's failures to comply with such protocols and assurances created a dangerous condition, no different for Sarah than was the swimming pool for the plaintiff in Leithead.
{14} The procedures in place for students with special needs like Sarah are akin to other measures that are important for the safe operation of any school building. For example, schools put in place fire plans to expedite a safe exit from the building. In the operation of the school, the threat of fire is treated in a specific manner, just as students with special health needs are treated in a specific way for their own safety. If a fire were to break out and school personnel were to fail to respond in a reasonable manner, *1263 then few would question that the school was negligent in the "operation" of the school building within the meaning of the TCA. Sarah's situation draws a close parallel. The School District failed to follow through on its safety policies for students with special needs and students in acute medical distress, an act of negligence in the operation of the school no less portentous to its students than a failure to implement appropriate fire exit procedure.

The School District's Response: Negligent Supervision Creating a Risk Only for Sarah Individually is not the Operation of a Building Under the TCA
{15} To rebut the Uptons' claims, and relying primarily upon our precedent in Espinoza, the School District argues that, at its core, the Uptons' complaint amounts to nothing more than a claim of negligent supervision of one student during a physical education class, which does not rise to the level of a dangerous condition affecting students generally. The Court of Appeals agreed with the School District, which squarely presents us with an opportunity to clarify our case law. Upton, 2005-NMCA-085, ¶ 11, 137 N.M. 779, 115 P.3d 795.
{16} This Court previously stated in Espinoza that a complaint alleging nothing more than negligent supervision is not actionable, because the TCA does not specify a tort waiver for negligent supervision. To be more precise, Section 41-4-6 waives immunity for the operation or maintenance of a public building, which may include proof of negligent acts of employee supervision that is part of the operation of the building. See Leithead, 1997-NMCA-041, ¶ 8, 123 N.M. 353, 940 P.2d 459 (stating a claim that involves elements of negligent supervision can still fall under the waiver if that supervision is directly tied to the "operation or maintenance" of the building). But the claim cannot be based solely on negligent supervision. See id. (holding "a claim of negligent supervision, standing alone, is not sufficient to bring a cause of action within the waiver of immunity created by Section 41-4-6").
{17} In Espinoza, a child was injured on a public playground after falling from a slide while attending a city-sponsored day camp. 120 N.M. at 681, 905 P.2d at 719. The child's parents claimed two kinds of negligent supervision: (1) an inadequate number of day camp personnel to supervise the children and (2) negligence by day camp personnel in not watching their child closely enough. Id. at 681-82, 905 P.2d at 719-20. This Court rejected the parents' claim under Section 41-4-6 because in their pleadings the parents alleged nothing more than negligent supervision which, of course, is not a specific waiver under the TCA. Id. at 683-84, 905 P.2d at 721-22. We also relied on a corollary proposition that the TCA does not waive immunity for a single, discrete administrative decision affecting only a single person, as opposed to a dangerous condition affecting the general public. Id. (citing Archibeque v. Moya, 116 N.M. 616, 619, 866 P.2d 344, 347 (1993), where this Court held that one employee's negligent performance of an administrative function, putting at risk a single individual, did not fall under the waiver of immunity).
{18} Upon close analysis, we find unpersuasive the School District's attempt to draw a parallel between these cases and the Uptons' claim. The Uptons clearly assert much more than negligent supervision of their daughter. As discussed above, the Uptons challenge the School District's general failure to implement promised safety policies for at-risk students. The Uptons claim the School District negligently put in motion a chain of events that both preceded and followed the specific decisions of the hapless substitute teacher. The school failed to implement Sarah's IEP, to respond appropriately to the specific information it was given about Sarah's condition, and to implement the specific assurances given to the Uptons about the care the school was to provide in light of Sarah's special needs. The substitute teacher, a school employee, forced Sarah to continue her exercise despite tangible evidence of her distress. Then, the school failed to properly implement its emergency procedures. Faced with Sarah's acute distress, the school *1264 never administered CPR, no one called 911 in a timely manner, Sarah was simply wheeled outside to await emergency personnel. Thus, the Uptons challenge far more than a single failure of oversight by one overworked teacher.
{19} We acknowledge that a school building is not as inherently dangerous as a swimming pool, and thus, the distinction between negligent supervision "standing alone" and negligent supervision tied directly to the operation of the school building is not as readily apparent as in Leithead. A comparison between this Court's prior decision in Archibeque and a subsequent opinion of our Court of Appeals in Callaway v. New Mexico Department of Corrections, 117 N.M. 637, 875 P.2d 393 (Ct.App.1994) may illustrate the distinction.
{20} In Archibeque, a prison administrator negligently failed to check a list of names before placing an inmate into an area of the prison with his known enemies. 116 N.M. at 618, 866 P.2d at 346. In declining to equate this with negligent operation of a building under Section 41-4-6, Chief Justice Ransom noted the difference between cases involving only a "discrete administrative decision" that did not make the premises any more dangerous beyond "the reasonable and expected risks of prison life," and the cases demonstrating "a general condition of unreasonable risk from negligent security practices," for which the TCA does waive immunity. Archibeque, 116 N.M. at 622, 866 P.2d at 350 (Ransom, J., specially concurring). That general condition later surfaced in Callaway when prison officials allowed violent gang members to mingle with the general prison population, thereby creating a dangerous condition based on more than just a single administrative decision affecting only one inmate as in Archibeque. See Callaway, 117 N.M. at 643, 875 P.2d at 399.
{21} The distinction between Archibeque and Callaway carries over to the present case. If the only alleged misconduct toward Sarah had been the substitute PE teacher failing to watch her while she participated in physical exercise, the Upton's claim would be much closer to the single administrative decision in Archibeque. It would be practically identical to the single claim of negligent supervision we found inadequate in Espinoza. But here we have behavior that goes beyond these limits. First the school ignored the information it was given by the Uptons. This led to the school actively participating in causing the asthma attack by forcing Sarah to do more exercise than she was supposed to do. Actively forcing students, who are known to have health problems, creates a foreseeable risk that such a health emergency will occur. Then the school failed to follow through with proper emergency procedures, negligent omissions that exacerbated the problem caused by its previous negligent actions. These actions and omissions combined to create the dangerous condition, placing Sarah in a far worse position than "the reasonable and expected risks of [school] life." This case is more closely aligned with Callaway than Archibeque, and it is wholly dissimilar from Espinoza.
{22} For its final point, the School District again relies on Espinoza to argue that it only created a dangerous condition for a single individual, Sarah, not the general public or the students at large. This is a significant distinction because this Court has previously stated that "the critical question is whether the condition creates a potential risk to the general public." Espinoza, 120 N.M. at 683, 905 P.2d at 721 (emphasis added). We acknowledge that this language from Espinoza can be subject to misinterpretation, and we take this opportunity to clarify it.
{23} As previously applied by this Court and our Court of Appeals, the reference to the "general public" in Espinoza does not mean a condition that must be dangerous to the entire public, but rather, at least potentially, to the particular class of people that use the building or facility in question. See Castillo, 107 N.M. at 205, 755 P.2d at 49 (roaming dogs were threat to residents and invitees of housing development); Callaway, 117 N.M. at 641-42, 875 P.2d at 397-98 (roaming gang was threat to prison population); *1265 Leithead, 1997-NMCA-041, ¶ 15, 123 N.M. 353, 940 P.2d 459 (indicating lack of lifeguards was threat to swimming public); Baca v. State, 1996-NMCA-021, ¶¶ 10-11, 121 N.M. 395, 911 P.2d 1199 (stating security officers were threat to the attendees of the State Fair). The key point in Espinoza is that the negligence must be of a kind which makes the premises dangerous, or potentially so, to the affected public, the consumers of the service or the users of the building, including the plaintiff. Cf. Archibeque, 116 N.M. at 619, 866 P.2d at 347 (holding administrative decision pertaining to a single individual and the specific threats posed to that individual did not qualify under the building waiver); Espinoza, 120 N.M. at 681, 905 P.2d at 719 (holding failure to adequately supervise one specific child on a playground slide did not qualify under the building waiver).
{24} In Castillo, Callaway, Baca, and Leithead, only one person was injured but the risk posed was to a group of people using the park or building. The same is true for Sarah. Failure to respond appropriately to an emergency medical situation is a potential threat to every student in school because such a situation can occur at any time, regardless of special health needs. The school's indifference towards Sarah's special medical needs makes it more likely that all similarly situated students were at risk as well. The same policies that led the Uptons to rely on the school's diligence were in place for other at-risk students. This is not a case of action uniquely affecting only one student. The school's failures, if proven, created a dangerous condition for all special-needs children, and with regard to emergency responsiveness, for every student at the school.
{25} Accordingly, we hold that the Uptons have stated a claim which, if proven, constitutes negligence in the operation or maintenance of a building within the waiver of tort immunity set forth in Section 41-4-6. The Uptons are entitled to an opportunity to prove their claim to a jury.

CONCLUSION
{26} For the foregoing reasons, we reverse the opinion of the Court of Appeals and remand for further proceedings consistent with this Opinion.
{27} IT IS SO ORDERED.
WE CONCUR: PATRICIO M. SERNA, PETRA JIMENEZ MAES, and EDWARD L. CHÁVEZ, Justices.
PAMELA B. MINZNER, Justice (dissenting).
MINZNER, Justice (dissenting).
{28} I respectfully dissent. I would affirm the district court's grant of summary judgment for the Clovis Municipal School District on the basis of the analysis within the Court of Appeals' opinion. The Court of Appeals discussed the waiver of governmental immunity provided by Section 41-4-6 of the Tort Claims Act (TCA), NMSA 1978, §§ 41-4-1 to -29 (1976, as amended through 2004), and our case law interpreting this waiver. Upton v. Clovis Mun. Sch. Dist., 2005-NMCA-085, 137 N.M. 779, 115 P.3d 795. In analyzing our case law interpreting Section 41-4-6, the Court of Appeals distinguished "between the creation of a dangerous condition that places the general public at risk, which results in a waiver, and negligent supervision, which does not." Id. ¶ 10. The Court of Appeals concluded that this case involves the negligent supervision of a single child, rather than a dangerous condition that placed the general public at risk. Id. ¶ 11. Furthermore, the Court of Appeals noted that our cases have "made it clear that administrative or supervisory functions do not equate with the `operation of any building' or call for a waiver of immunity." Id. ¶ 12. I also agree with Judge Sutin's special concurrence, which emphasizes the Legislature's authority to revise the TCA.
{29} As the majority opinion notes, the TCA "grants all government entities and their employees general immunity from actions in tort, but waives that immunity in certain specified circumstances." Maj. Op. ¶ 8. Thus, the rule is immunity; waiver is the exception. The majority opinion construes *1266 Section 41-4-6 as an exception to the TCA within which the facts of record fit and concludes that the Legislature intended to waive immunity on these facts.
{30} The majority opinion states that the negligent "operation or maintenance of any building" encompasses all cases in which the negligent action of a government entity creates "a dangerous condition that threatens the general public or a class of users of the building." Maj. Op. ¶ 8. That statement, however, rests on what the majority characterizes as language in Espinoza v. Town of Taos, 120 N.M. 680, 683, 905 P.2d 718, 721 (1995), which requires clarification. See Maj. Op. ¶ 22.
{31} In clarifying the reference to the "general public" in Espinoza, the majority opinion reasons that our cases only require a condition that is dangerous "to the particular class of people that use the building or facility in question." Maj. Op. ¶ 23. If the creation of a condition injures a member of a class or group that uses a building, the majority concludes, the creation of that condition can be said to be "operation or maintenance of any building" within Section 41-4-6. Maj. Op. ¶ 24. It seems to me, however, that the majority opinion expands our case law without acknowledging it is doing so and without explaining why on these facts it is within our authority to do so.
{32} As Judge Sutin's special concurrence makes eloquently clear, none of us can or would deny the harm that has been done, nor does it lie within our power to un-do that harm. Our task is more ordinary and familiar. We are charged not with expanding our case law as an independent source of law, but rather with construing the Legislature's intent in enacting Section 41-4-6.
{33} The majority opinion identifies, within a handful of cases, a broad interpretation of the Legislature's intent "to protect private citizens from the consequences of dangerous conditions created by the negligence of public employees in the `operation or maintenance' of public buildings." Maj. Op. ¶ 9. The Legislature's intent, however, is expressed in the language the legislators chose. The phrase "operation or maintenance" does not actually refer to a condition that is dangerous to members of the class or group that use the building. The application or expansion of the phrase in the handful of cases to which the majority refers does not help us understand the Legislature's intent for the facts of record in this appeal; rather, these cases illustrate the generality of the phrase and the difficulty trial and appellate courts have had in limiting the exception.
{34} At some point, however, just as a quilt maker must return to the original pattern in cutting subsequent squares, this Court needs to focus on the words the Legislature has used, which is the approach the Court of Appeals followed in affirming the district court. I would do the same. My colleagues being of a different view, I respectfully dissent.