SUTIN, Judge (dissenting). {33} I respectfully dissent. {34} The Majority Opinion acknowledges that “[t]he central question is whether the negligent operation or maintenance of a building creates a ‘dangerous condition that threatens the general public or a class of users of the building.’” Majority Opinion, ¶ 8. The Opinion cites and discusses Upton, 2006-NMSC-040, as though Upton is the case on which Encinias places his main reliance. Majority Opinion, ¶¶ 2, 8, 10-11, 13-14. The Opinion holds “that the seemingly broad rule about school immunity stated in Upton . . . does not extend so far as to provide relief to Encinias in this case.” Majority Opinion, ¶ 2. Yet the Opinion acknowledges that “[ejvidence proffered below indicates that it may have been the responsibility of a security guard or faculty member to patrol the food vendor area and that no one patrolled that area at the time of the attack.” Id. ¶ 9. The Opinion acknowledges that “[i]n an affidavit, the assistant principal stated that the location of the attack near the food vendors was a known ‘hot zone’ for student violence and that a security guard was supposed to patrol that area during the lunch period[,]” and further that “‘hot zones were locations where students congregate and where there has been a history of problems that exist such as fights.’” Id. ¶¶ 9, 17 (alterations omitted). The Opinion acknowledges that, in another affidavit, an affiant stated that “a security guard or teacher usually patrolled the food vendor area, but neither was present at the time of the attack.” Id. ¶ 9. The Opinion acknowledges that Encinias’s claim is “couched in terms of a failure to follow a safety policy}.]” Id. ¶ 13. And the Opinion acknowledges that “Encinias alleges that a security guard or teacher failed to patrol the area in accordance with stated policies and procedures.” Id. ¶ 16. {35} The Majority Opinion appears to acknowledge the existence of the school’s printed “report card}.]” Majority Opinion, ¶ 19. The report card states, “}e]ach year, every New Mexico school district is required to collect and report to its community a variety of information about the district and its schools” and also states that “}t]his report card includes data for the five required statewide indicators},]” listing “School Safety” as one of the five indicators. The report card explains that “}t]o demonstrate school safety, schools are asked to report” such matters as: • an accepted school-level safety plan; • a plan for staff development in the area of school safety; • identified goals and benchmarks for progress toward school safety”; and, under “Benchmarks,” that 2. Local school district plans for safe schools will be developed and implemented to assure the safety of all students and staff at school. 5. School staff will not tolerate harassment of anyone in any form at school. . . . 10. School district will ensure that school buildings and grounds are designed or adapted to promote security. And, last, the report card states: The safety of students and staff is a primary concern of the current [school] administration. We have implemented a program to review and address all of our policies and procedures in our school safety handbook. A district consortium of school personnel, law enforcement, and fire department officials has been assembled to review all aspects of school safety at all the school sites including [Robertson High School], As part of that program, we are conducting extensive drills to insure the safety of all staff and students in our care. Additionally, the [school] campus has been undergoing extensive remodeling to its building to ensure the safety codes outlined by state and local authorities are being met. Concerning the Number of Police Reported Incidents, the administration believes that our numbers are well below [s]tate averages. However, we also believe that any criminal activity on school grounds is unacceptable. We have initiated a number of procedures to help reduce criminal activity at [the school] including the following: we have brought drug dogs to search the entire campus; we have two security guards to patrol our campus daily; we have a mediation program consisting of school counselors to conduct mediations whenever there is a conflict with [the school’s] students; and we have placed security cameras throughout the campus to better enable the policing of our campus. We take the safety of all of [the] students and staff very seriously at [the school,] and we are implementing policies and programs to ensure everyone’s safety. This report card document evidences a definite safety policy with respect to safety of students and implementation of the policy, as well as implementation of programs to ensure safety. {36} The affidavit of a security guard at the school stated that, of two guards, one “would be at an area where the students congregated for the lunch period.” “One of the specific areas” mentioned in this affidavit is the location in question, namely, “the location of the vendor trucks on [Fifth] Street in front of the Administration Building.” This affidavit at the very least raises a reasonable inference that a guard was to be stationed at the area where Encinias was attacked, pursuant to the policies and programs of the school to ensure the security and safety of students. {37} The assistant principal’s affidavit stated that “[t]he area where the vendor trucks parked was considered to be a ‘hot zone’ for potential trouble around the school.” She stated that a security guard “was responsible for watching that area.” She defined “hot zones” as “locations where students congregate and where there has been a history of problems that exist such as fights.” This evidence imputes knowledge on the part of the school that the area where Encinias was attacked was an unsafe area requiring security. Further, the affidavit stated that at least a portion of the duty of the assistant principal during the lunch period was to patrol this area. {38} In deposition testimony, Encinias’s expert (Blauvelt) testified that it was his opinion that “[s]chool administration has a duty to protect students in the identified danger zone.” The witness further stated that the school had identified the vendor area as a danger zone in the school’s “Emergency Procedures[.]” {39} Our case law solidly holds that, in the context of Section 41-4-6, the phrase “operation or maintenance” must be interpreted broadly. See Williams, 1998-NMCA-006, ¶ 10 (“We . . . observe that on several occasions our Supreme Court has rejected a narrow view of ‘operation or maintenance’ with respect to public buildings, in favor of a broad interpretation of Section 41-4-6[.]”). Under a broad interpretation, Section 41-4-6 includes a duty “to exercise reasonable care to prevent or correct dangerous conditions on public property.” Williams, 1998-NMCA-006, ¶ 10. {40} The Majority Opinion changes from analysis of the reach of negligent operation or maintenance to the concept of negligent supervision, focusing on a view that Encinias’s allegation “is solely a claim for negligent supervision.” Majority Opinion, ¶¶ 11-13, 17-18. When the issue is whether the negligence is that of supervision or that of operation or maintenance, the development of the still mushy, or as the Majority characterizes it, “murky,” law of immunity waiver still has a way to go. The Majority Opinion does not advance the development. It is not helpful to hold as the Majority does that the circumstances as a matter of law constitute negligent supervision by relying on fully distinguishable negligent supervision cases. Nor is it helpful to distinguish Upton, an operation and maintenance case far different from this case. Encinias actually places little reliance on Upton. It seems to me that the case now before us should stand or fall as a negligent operation or maintenance case, not a negligent supervision case. {41} As indicated in the Majority Opinion, Whitener sought, and the district court granted, the cover of malpractice case law precluding malpractice relief where it is obvious that the state (here the school or school district) was immune from tort liability if it were sued in an action and therefore obvious that the underlying claim would not be viable. Majority Opinion, ¶ 1. Whether an action is viable depends on whether it states a claim of breach of a duty “to exercise reasonable care to prevent or correct dangerous conditions on public property.” Williams, 1998-NMCA-006, ¶ 10. In this case, the evidence presented on the issue of negligent operation or maintenance of public property included the known existence of a danger zone for violence at a particular location and during a particular segment of time that students congregated. From evidence presented, a reasonable inference could be drawn that the school had implemented a safety policy by requiring a security guard to be at the danger zone and by having a faculty member patrol at the area during the danger period. {42} The failure of security and safety under these circumstances could constitute the creation of a dangerous condition that threatened students congregating in the area. In my view, this comes closer to the Section 41-4-6 building and grounds immunity waiver cases than to those hinged on negligent supervision. See Cobos, 1998-NMSC-049, ¶ 18 (imposing, based on “the relationships of the actors[,] ... at least limited duties of operation or maintenance”); Bober, 111 N.M. at 653, 808 P.2d at 623 (adopting the “broader view” articulated in Castillo that Section 41-4-6 contemplated immunity waiver with respect to negligent injury “arisfing] from an unsafe, dangerous, or defective condition on property” and permitting an action under that section where the State Fair failed to install traffic control devices); Castillo, 107 N.M. at 207, 755 P.2d at 51 (holding a waiver of immunity if the Housing Authority had knowledge “of the unsafe condition represented by dogs running loose within the project”); Williams, 1998-NMCA-006, ¶¶ 1-2, 17 (permitting an action under Section 41-4-6 for a school’s negligence in failing to place safety glass in a window and with no protective device to shield it); Leithead, 1997-NMCA-041, ¶¶ 1, 12 (permitting an action under Section 41-4-6 for negligent provision of lifeguard services at a public swimming pool “even though it may also involve elements of negligent supervision of children”); Callaway, 117 N.M. at 643, 875 P.2d at 399 (holding that the plaintiff stated a claim under Section 41-4-6 for “allowing the known and dangerous gang members loose to victimize the general prison population”). JONATHAN B. SUTIN, Judge