IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2023-NMCA-070

Filing Date: July 13, 2023

No. A-1-CA-39570

CANDI A. GEBLER,

      Plaintiff-Appellant,

v.

VALENCIA REGIONAL EMERGENCY
COMMUNICATIONS CENTER, BOARD
OF DIRECTORS OF VALENCIA REGIONAL
EMERGENCY COMMUNICATIONS CENTER,
SHIRLEY VALDEZ, DOES 1-5, EMPLOYEES
ON DUTY 1-5, and ENTITIES, CORPORATIONS,
PARTNERSHIPS 1-5,

      Defendants-Appellees.

APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY
James A. Noel, District Court Judge

Rios Law Firm, P.C.
Linda J. Rios
Michael G. Solon
Albuquerque, NM

for Appellant

Montgomery & Andrews, P.A.
Randy S. Bartell
Kaleb W. Brooks
Santa Fe, NM

for Appellees

## OPINION

**BUSTAMANTE, Judge, retired, sitting by designation.**

**{1}** Plaintiff Candi Gebler appeals from the dismissal by summary judgment of her personal injury action, contending that the district court erred when it concluded that Defendants were immune from suit under the New Mexico Tort Claims Act (TCA), NMSA 1978, §§ 41-4-1 to -27 (1976, as amended through 2020). Plaintiff argues that Defendant Valencia Regional Emergency Communications Center (the VRECC) is not a "local public body" within the meaning of Section 41-4-3(C) of the TCA, and thus, its employees are not public employees within the meaning of Section 41-4-3(F). Alternatively, Plaintiff argues that if the TCA applies, she can yet maintain her action under Section 41-4-6. We affirm.

## BACKGROUND

**{2}** Pursuant to the Joint Powers Agreements Act, NMSA 1978, §§ 11-1-1 to -7 (1961, as amended through 2009), the City of Belen, the Village of Los Lunas, the Village of Bosque Farms, and Valencia County signed a joint powers agreement to form the VRECC. The VRECC was created pursuant to the New Mexico Enhanced 911 Act, NMSA 1978, §§ 63-9D-1 to -11.1 (1989, as amended through 2017) to provide enhanced 911 emergency communications functions for an area that includes the "incorporated boundaries of the [m]unicipalities and the [c]ounty of Valencia, excluding the Pueblo of Isleta."

**{3}** This case arises from a dispatch issued from the VRECC after Selena Lucero (Mother) made a nonemergency call around 4:00 p.m. to the VRECC regarding her son, Mark Lucero (Lucero). During the phone call, Mother spoke to three separate employees of the VRECC. Mother informed the VRECC employees that Lucero had just gotten out of jail and that he was outside his home beating animals. That information was documented in the computer-aided dispatch system (CAD) and was available to the officers dispatched to the scene. Mother also gave information to the VRECC employees that was *not* documented in the CAD and *not* available to the officers. She told them that Lucero had "mental challenges," he was without his medications, he needed his medications because he did not function well without them, and she asked that he be taken to the hospital. Mother also told them that Lucero was getting into a vehicle trying to leave, his brother-in-law was trying to stop him from leaving, he was a danger to himself and others, and that she was scared.

**{4}** Based on the call, the VRECC dispatched the Valencia County Sheriff's Office to the address provided by Mother. Plaintiff was one of the four officers dispatched to the scene. Upon Plaintiff's arrival, Lucero got into his car, hit one of the other officer's vehicles with his car, drove off, turned around, and drove at a high rate of speed into the vehicle that Plaintiff was sitting in. The collision pushed Plaintiff's vehicle into an embankment, inflicting physical injuries on Plaintiff.

**{5}** Plaintiff initially filed suit against the Villages of Los Lunas and Bosque Farms (collectively, the Villages), Valencia County, the VRECC, the board of directors of the VRECC, Shirley Valdez, Employees on Duty 1-5, and others no longer involved in the case for personal injuries stemming from Defendants' alleged negligence. The Villages

were dismissed from the action based on the district court's conclusion that "the facts alleged in the complaint do not come within the scope of the waiver of sovereign immunity of [Section] 41-4-6 relied upon by Plaintiff." Valencia County was dismissed from the action with prejudice by stipulated order. The Villages and Valencia County are not involved in this appeal.

{6}     Defendants left in the case after the Villages and Valencia County were dismissed filed a motion for summary judgment, arguing that the district court's decision concerning Section 41-4-6 was equally applicable to them and mandated dismissal. Plaintiff responded arguing—for the first time in the action—that the VRECC was not a governmental entity immune from suit under the TCA and, even if it was, the building waiver pursuant to Section 41-4-6 applied to these circumstances. After a hearing, the district court determined that the VRECC was a governmental entity for purposes of the TCA and Section 41-4-6 did not waive Defendants' immunity. The district court granted Defendants' motion for summary judgment and dismissed all remaining claims with prejudice. Plaintiff appeals.

## DISCUSSION

### I.     The VRECC Is a "Governmental Entity" Under the TCA

{7}     In both her initial and amended complaints, Plaintiff alleged that the VRECC and its board of directors were "a government municipality/entity created under the laws of the State of New Mexico." Despite that assertion, in response to Defendants' motion for summary judgment, Plaintiff argued in conclusory fashion that the VRECC did not meet the definition of a local public body under Section 41-4-3(C) of the TCA, and thus it was not a governmental entity granted immunity from liability in tort under Section 41-4-4(A). Plaintiff also noted that the VRECC was not among the entities granted immunity by Section 63-9D-10 of the Enhanced 911 Act. The district court rejected both contentions. On appeal, Plaintiff abandons her argument based on Section 63-9D-10 and we do not address it further.

{8}     Section 41-4-4(A) of the TCA grants immunity from liability in tort to a "governmental entity and any public employee while acting within the scope of [their] duty." A "governmental entity" is defined in Section 41-4-3(B) of the TCA as "the state or any local public body as defined in Subsections C and H of this section." No one contends that the VRECC is a "state" entity, thus the only question is whether it meets the definition of a "local public body." Section 41-4-3(C) defines "local public body," in pertinent part, to include "all political subdivisions of the state and their agencies, instrumentalities and institutions." Resolution of the case requires us to address a question of first impression in New Mexico: whether the VRECC is an agency, instrumentality, or institution of one or more political subdivisions of the state under Section 41-4-3(C). To answer this question, we must interpret Section 41-4-3(C), the Joint Powers Agreements Act, and the Enhanced 911 Act. Thus, our standard of review is de novo. *See Cooper v. Chevron U.S.A., Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382,

49 P.3d 61 (noting that construction of statutes presents a legal question that we review de novo).

**{9}** The purpose of the Enhanced 911 Act is "to further the public interest and protect the safety, health and welfare of the people of New Mexico by enabling the development, installation and operation of enhanced 911 emergency reporting systems to be operated under shared state and local governmental management and control." Section 63-9D-2(B). Driving the point home, the Legislature specifically noted that local governing bodies could use joint powers agreements to create separate entities to provide enhanced 911 services. Section 63-9D-4(B). Thus the Legislature has determined that combined 911 services are a critical component of the ability of local governments to fulfill their most basic responsibility: protecting the health and safety of their citizens.

**{10}** The Joint Powers Agreements Act provides the fiscal and administrative framework for the creation and management of the contractual agreements between public agencies by which they can "jointly exercise any power common to the contracting parties." Section 11-1-3. The term "public agency" specifically includes counties and municipalities. Section 11-1-2(A). There is no question that the parties to the VRECC joint powers agreement had the authority to enter into the agreement. Once created in an approved agreement, the entity "shall possess the common power specified in the agreement." Section 11-1-5(C). Thus the entity—here, the VRECC—possesses the same duty and power to provide the 911 emergency communications services as the Villages and Valencia County.[1]

**{11}** The agreement establishing the VRECC reflects this purpose and reality. And, the VRECC agreement reflects its intent to create a public entity. The board of directors of the VRECC is composed of the top administrators and law enforcement officials of the Villages and Valencia County. The term of office for members of the board is coincident with their term of office at the Villages and Valencia County. The VRECC board meetings are required to be held in accordance with the Open Meetings Act, NMSA 1978, §§ 10-15-1 to -4 (1974, as amended through 2013).

**{12}** In short, the VRECC is an entity created pursuant to statute to provide basic safety and health services on behalf of the Villages and Valencia County. The VRECC is controlled by the Villages and Valencia County, and it possesses their same powers and duty with regard to the health and welfare of their citizens. In this context, it would be—colloquially speaking—weird not to deem the VRECC an instrumentality of the Villages and Valencia County. We hold that it is an instrumentality under the TCA. Finally, we note that our conclusion agrees with the *Black's Law Dictionary* definition of "instrumentality": "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body." *Instrumentality*, *Black's Law Dictionary* (11th ed. 2019).

---

1As we noted above, the City of Belen is also part of the VRECC. However, as it is not part of this litigation, we do not reference it in our analysis.

## II.  Section 41-4-6 Does Not Waive Immunity in This Context

**{13}**  In her amended complaint, Plaintiff alleged that Defendants' "failure to properly maintain communication log books" and "failure to relay information regarding . . . Lucero's criminal history, behavior, and/or mental/emotional state to Plaintiff . . . amounted to negligent operation and maintenance of the dispatch system and/or center." Plaintiff did not allege that the physical facilities of the dispatch center were defective in any manner. Her focus throughout has been on assertions that the call from Mother was mishandled by the dispatchers.

**{14}**  Section 41-4-4(A) of the TCA grants blanket immunity to governmental entities and public employees from liability in tort except as waived by Sections 41-4-5 through 41-4-12. *See Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 8, 140 N.M. 205, 141 P.3d 1259. Given Plaintiff's allegations of negligence, only Section 41-4-6 is implicated in this case. Commonly referred to as the "building waiver," *Cobos v. Doña Ana Cnty. Hous. Auth.*, 1998-NMSC-049, ¶ 1, 126 N.M. 418, 970 P.2d 1143, Section 41-4-6(A) allows suits seeking recompense for "bodily injury . . . caused by the negligence of public employees . . . in the operation or maintenance of any building, public park, machinery, equipment or furnishings."

**{15}**  Section 41-4-6 has been the subject of considerable judicial attention since its enactment. The earliest cases limited the reach of Section 41-4-6 to instances where injury was caused by a physical defect in the building. *Wittkowski v. Corrs. Dep't of N.M.*, 1985-NMCA-066, ¶ 17, 103 N.M. 526, 710 P.2d 93, *overruled on other grounds by Silva v. State*, 1987-NMSC-107, ¶ 15, 106 N.M. 472, 745 P.2d 380; *Pemberton v. Cordova*, 1987-NMCA-020, ¶¶ 5, 6, 105 N.M. 476, 734 P.2d 254, *abrogated on other grounds as recognized by Williams v. Cent. Consol. Sch. Dist.*, 1998-NMCA-006, 124 N.M. 488, 952 P.2d 978; *Martinez v. Kaune Corp.*, 1987-NMCA-131, ¶¶ 6, 7, 106 N.M. 489, 745 P.2d 714; *Gallegos v. State*, 1987-NMCA-150, ¶ 8, 107 N.M. 349, 758 P.2d 299. New Mexico courts began to retreat from that narrow reading of the statute in *Castillo v. County of Santa Fe*, 1988-NMSC-037, 107 N.M. 204, 755 P.2d 48. There, our Supreme Court decided that the property surrounding a public building was covered under the concept of "building" as used in Section 41-4-6. *Castillo*, 1988-NMSC-037, ¶ 7. The Court also held that the concept of "maintenance" could encompass a duty to exercise reasonable care to react to and guard against conditions not connected to the physical condition of the building and surrounding grounds. *Id.* ¶¶ 7-10. In *Castillo* the condition was loose roaming dogs. *Id.* ¶ 4. The Court held that the complaint stated a claim upon which relief could be granted. *Id.* ¶ 10.

**{16}**  The retreat from the narrow "physical defect" view of Section 41-4-6 was completed in *Bober v. New Mexico State Fair*, 1991-NMSC-031, ¶¶ 25-29, 111 N.M. 644, 808 P.2d 614 (holding that the State Fair had a duty to run its operations in a manner that would not create unsafe conditions on adjoining streets). Our Supreme Court in *Bober* first noted that under Section 41-4-2(B), "[l]iability for acts or omissions under the [TCA] shall be based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." *Bober*,

1991-NMSC-031, ¶ 25 (internal quotation marks and citation omitted). *Bober* then emphasized that liability under Section 41-4-6 was not limited to "maintenance" of public property, but "also arises from the 'operation' of any such property." *Bober*, 1991-NMSC-031, ¶ 27. It is the emphasis on the term "operation" that set the analysis in *Bober* apart from prior cases. *See Callaway v. N.M. Dep't of Corrs.*, 1994-NMCA-049, ¶ 15, 117 N.M. 637, 875 P.2d 393. *Bober*'s reference to operations also set the stage for a series of difficult, sometimes contradictory, cases—some concluding that Section 41-4-6 applies to allow an action to continue; some refusing to find Section 41-4-6 applicable. Our task is to determine where Plaintiff's action lies on the spectrum.

**{17}**     The first significant case to analyze the scope of Section 41-4-6 following *Bober* was *Archibeque v. Moya*, 1993-NMSC-079, 116 N.M. 616, 866 P.2d 344. There, an inmate in a New Mexico prison was assaulted on his first night in the facility. *Id.* ¶ 2. He sued in federal court asserting that the department of corrections was negligent when it released him into the general population without appropriately checking the printout of current inmates for "known enemies." *Id.* ¶¶ 2, 3. Upon certification, our Supreme Court—citing *Wittkowski*, 1985-NMCA-066—stated broadly that "operation and maintenance of the penitentiary premises" did "not include the security, custody, and classification of inmates." *Archibeque*, 1993-NMSC-079, ¶ 8 (internal quotation marks omitted). Our Supreme Court seemed to narrow this broad language when it noted that the administrator was merely "performing an administrative function associated with the operation of the corrections system." *Id.* Later in the opinion, our Supreme Court also noted that the misclassification that led to the assault did not in and of itself "create an unsafe condition on the prison premises as to the general prison population." *Id.* ¶ 11. Our Supreme Court noted its concern that waiving immunity for every act of negligence that created a "risk of harm for a single individual would subvert the purposes of the [TCA]." *Id.*

**{18}**     Chief Justice Ransom specially concurred, cautioning against the potential effects of the majority's broader language, but agreeing with the result because the negligent "discrete administrative decision" did "not change the condition of the premises." *Id.* ¶ 17 (Ransom, C.J., specially concurring).

**{19}**     This Court considered a prisoner's claim against the department of corrections a few months later in *Callaway*, 1994-NMCA-049. In *Callaway*, the plaintiff was also beaten by other inmates on the first day he was transferred to the facility. *Id.* ¶ 4. In contrast to the factual allegations in *Archibeque*, the plaintiff alleged that the prison was "negligent in allowing the known and dangerous gang members loose to victimize the general prison population." *Callaway*, 1994-NMCA-049, ¶ 18. This Court concluded that there was a substantive distinction between the two fact-patterns, and held that the claim was actionable under Section 41-4-6. *Callaway*, 1994-NMCA-049, ¶¶ 19, 20. The difference in outcome was driven by the nature and impact of the negligent acts alleged. *Id.* ¶ 19. In *Archibeque* the negligence was a single act of improper review of records. 1993-NMSC-079, ¶¶ 2, 11. There was no indication that there was a more widespread problem with record review. *Id.* ¶ 11. In *Callaway* the negligence alleged involved violent, armed, "roaming gang members," who "created a dangerous condition on the

premises of the penitentiary" and foreseeable danger to other inmates. 1994-NMCA-049, ¶ 19. From this we discern that Section 41-4-6 waives immunity if the alleged negligence involves a problem that implicated the core of how the prison was being run or—in the words of the statute—operated. *Callaway*, 1994-NMCA-049, ¶ 18.

**{20}** The next case decided after *Bober* involving Section 41-4-6 and its "operations" waiver was *Espinoza v. Town of Taos*, 1995-NMSC-070, 120 NM 680, 905 P.2d 718. In *Espinoza* a child was hurt when he fell off a slide in a public playground while participating in a summer day camp program run by the municipality. *Id.* ¶¶ 2, 3. Plaintiffs alleged that the accident occurred because the supervisors assigned to the camp were negligent in supervising the child's activities. *Id.* ¶¶ 2, 4, 6. Citing *Seal v. Carlsbad Independent School District*, 1993-NMSC-049, 116 N.M. 101, 860 P.2d 743, the plaintiffs argued that the absence of adequate supervision of children when using government recreational equipment was an "unsafe, dangerous or defective condition for which sovereign immunity ha[d] been waived." *Espinoza*, 1995-NMSC-070, ¶ 6 (internal quotation marks and citation omitted). Our Supreme Court disagreed. *Id.* ¶ 14. First, the Court noted that *Seal* did not involve a claim of negligent supervision. *Espinoza*, 1995-NMSC-070, ¶ 6. Rather *Seal* turned on allegations that appropriate lifelines had not been installed and that lifeguards were not "present and acting as such" while the pool was being used. *Espinoza*, 1995-NMSC-070, ¶ 6. Thus, the Court asserted that it had not addressed the issue of negligent supervision in *Seal*. *Espinoza*, 1995-NMSC-070, ¶ 6. Second, the Court held unequivocally that Section 41-4-6 "does not grant a waiver for claims of negligent supervision." *Espinoza*, 1995-NMSC-070, ¶ 8. *Espinoza* relied in part on pre-*Bober* cases such as *Pemberton*, 1987-NMCA-020. *Espinoza*, 1995-NMSC-070, ¶ 8. It also relied on *Archibeque,* which it characterized as holding that Section 41-4-6 did not "waive immunity for negligent performance of an employee's duties." *Espinoza*, 1995-NMSC-070, ¶ 12. Our Supreme Court summarized the cases the plaintiffs relied on as involving "negligent conduct that itself created unsafe conditions for the general public." *Id.* ¶ 14. In sum, our Supreme Court opined that there was nothing wrong with the playground; the only thing that would give rise to a duty was the "day camp undertaking." *Id.* By separating the town's activity from the physical object, our Supreme Court decided that Section 41-4-6 simply did not apply. *Espinoza*, 1995-NMSC-070, ¶ 14; *see also Baca v. State*, 1996-NMCA-021, ¶ 12, 121 N.M. 395, 911 P.2d 1199 (acknowledging "candidly" that "the distinctions drawn in the cases in the area of waiver of immunity are exceedingly fine").

**{21}** In *Leithead v. City of Santa Fe*, 1997-NMCA-041, 123 N.M. 353, 940 P.2d 459, the endeavor to distinguish negligent supervision from negligent operation continued. This Court considered a claim that the city's failure to provide appropriate lifeguard services had caused a child to nearly drown. *Id.* ¶¶ 2, 3. The city asserted that the case was no more than a claim for negligent supervision, and thus controlled by the holdings in *Espinoza* and *Archibeque*. *Leithead*, 1997-NMCA-041, ¶ 7. Relying on *Seal*, this Court disagreed and imposed essentially a per se rule that a "swimming pool without an adequate number of trained lifeguards creates a dangerous condition on the physical premises which affects the swimming public at large." *Leithead*, 1997-NMCA-041, ¶ 15. In doing so, *Leithead* wove together the *Bober* concept of "operation" of a facility that is

not tied to any physical defect with the idea from *Archibeque* that negligence of public employees under Section 41-4-6 had to create an unsafe or dangerous condition for a larger population than just the plaintiff in any given case. *Leithead*, 1997-NMCA-041, ¶¶ 9-16.

**{22}**   The concepts of operation, negligent supervision, and threats to a larger population under Section 41-4-6 arose again in two cases in the public setting, but involving very different factual patterns, *Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶¶ 2-4, 310 P.3d 611 and *Upton*.

**{23}**   *Encinias* presented a Section 41-4-6 issue in an odd procedural posture. The primary case was a legal malpractice case based on a missed statute of limitations. *Encinias*, 2013-NMSC-045, ¶¶ 3, 4. The defendant law firm asserted that the claim should be dismissed because the case was not viable on the merits. *Id.* ¶ 1. The underlying case involved an incident in which a student at a high school was badly beaten by classmates at a location off of—but near to—the school campus. *Id.* ¶ 2. The student asserted that the high school was negligent in failing to protect him from the attack. *Id.* ¶ 7. The student's malpractice action was dismissed by the district court and this Court affirmed, concluding that the TCA did not waive the school's immunity. *Id.* ¶ 4.

**{24}**   Our Supreme Court reversed, relying on *Bober*, *Castillo*, and *Upton* (which we will discuss shortly), to emphasize that Section 41-4-6 waived immunity when public employee negligence results in an injury that can be ascribed to an "unsafe, dangerous, or defective condition on property owned and operated by the government." *Encinias*, 2013-NMSC-045, ¶ 10 (internal quotation marks and citation omitted). The Court observed that given the holdings in *Bober*, *Castillo*, and *Upton*, negligence could take many forms, including the "safety policies necessary to protect the people who use the building." *Encinias*, 2013-NMSC-045, ¶¶ 10-11 (internal quotation marks and citation omitted).

**{25}**   Our Supreme Court cautioned, however, that there are limits to the Section 41-4-6 waiver. *Encinias*, 2013-NMSC-045, ¶ 12. It noted the holding in *Espinoza* that there is no waiver for negligent supervision as such. *Encinias*, 2013-NMSC-045, ¶ 12. It also noted that in the school context "a single act of student-on-student violence does not render the premises unsafe." *Id.* ¶ 13 (citing *Pemberton*, 1987-NMCA-020). Our Supreme Court thus concluded that the result in *Pemberton* was correct—not based on the discredited rationale that Section 41-4-6 was limited to physical defect, but because there was no allegation or evidence in *Pemberton* that the school was on notice of a potentially dangerous condition portending student violence. *Encinias*, 2013-NMSC-045, ¶ 13. Ultimately our Supreme Court reinstated the plaintiff's malpractice action in *Encinias* because the record showed that the school was aware that the area where the attack occurred was a "hot zone" for student violence. *Id.* ¶ 18.

**{26}**   The cases we have so far discussed teach that the "operations" aspect of Section 41-4-6 will apply when a factual scenario can be fairly deemed to include either—or both—of the following characteristics. First, an operational failure to respond

to or discover conditions which can pose a danger to a class of persons involved in or affected by an activity on the property. *Castillo* and *Encinias* are examples of this type of scenario. Second, a failure to create and/or to implement reasonably appropriate safety policies and operational procedures to make public properties safe for the public who use them. *Leithead* and, more recently, *Prewitt v. Los Lunas Board of Education*, A-1-CA-37641, mem. op. ¶¶ 7-16 (N.M. Ct. App. June 9, 2020) (nonprecedential) are examples of this scenario.

**{27}** The second pertinent post-*Bober* case involving operation, negligent supervision, and threats to a larger population, *Upton*, 2006-NMSC-040, does not fit easily into either general category. Because, however, *Upton* provides the closest potential fit to Plaintiff's case, it is important to accurately assess its place in jurisprudence of Section 41-4-6. *Upton* arose from the tragic death of a teenage student who had suffered from asthma since early childhood. 2006-NMSC-040, ¶¶ 2, 5. The student's parents informed the school of her condition and made apparently satisfactory arrangements with the physical education teacher to limit the student's activities if they appeared to be triggering an attack. *Id.* ¶ 2. The parents also gave permission for the school to contact medical personnel in the event of an attack. *Id.* And the student's condition was noted on her individualized education plan with the school. *Id.*

**{28}** On the day of the student's death, a substitute teacher was in charge of the physical education class. *Id.* ¶ 3. The teacher required exercises that were more rigorous than usual. *Id.* The student reacted badly and asked for permission to stop. *Id.* The substitute teacher refused the request. *Id.* After the physical education class, the student went to her next class and, shortly after class began, collapsed at her desk. *Id.* ¶ 4. The school staff attempted to administer two inhaler treatments. *Id.* The school secretary checked the student's vital signs and asked the front office to call 911. *Id.* The student was then placed in a wheelchair and taken to the hallway. *Id.* No one administered CPR or other emergency protocols. *Id.* Fifteen minutes after she was placed in the hallway, a police officer saw the student and called 911 immediately. *Id.* ¶ 5. Evidence suggested this was the first time a 911 call had been placed. *Id.* By the time medical personnel arrived, the student was no longer breathing, and she died that afternoon. *Id.*

**{29}** It is fair to say that the student's death occurred as a result of a cascade of bad decisions, acts, and failures to act on the part of a number of school personnel. *Id.* ¶¶ 2-5. That said, however, it is difficult to equate their errors with either an operational failure to respond to dangerous conditions that affect a general class of persons or a failure to implement operational procedures to keep the school safe for the public who use the building. Our Supreme Court recognized as much when it acknowledged "that a school building is not as inherently dangerous as a swimming pool" and refused to apply the kind of categorical rule adopted in *Leithead*. *Upton*, 2006-NMSC-040, ¶ 19.

**{30}** In addition, *Upton* does not present a case in which a public entity has failed to recognize the need for—and actually implement—safety protocols. Appropriate

protocols were in place. *Id.* ¶¶ 2, 14. The school simply failed to follow them in that instance. *Id.* ¶ 14.

**{31}** Recognizing the problem, our Supreme Court used *Archibeque* and *Callaway* as illustrations of the "discrete administrative decision" versus "general condition" spectrum. *Upton*, 2006-NMSC-040, ¶¶ 20, 21 (internal quotation marks and citations omitted). Our Supreme Court decided that *Upton* fell on the general condition side based on the extraordinary "chain of events that both preceded and followed the specific decisions of the hapless substitute teacher." *Id.* ¶ 18. As the Court put it, the plaintiffs "challenge[d] far more than a single failure of oversight by one overworked teacher." *Id.* While we are not in a position to disagree with our Supreme Court's decision to reverse for trial, we are sympathetic to Justice Minzner's observation in dissent that the "opinion expands our case law without acknowledging it is doing so." *Id.* ¶ 31 (Minzner, J., dissenting).

**{32}** With that lengthy exegesis in mind, we turn to consider how the facts in this case fall within the Section 41-4-6 spectrum that we have outlined. Plaintiff's briefing in this Court recites in some detail the information that was not provided to her by the VRECC's dispatchers. The information was not provided either because it was not gathered by the dispatchers, or because it was not conveyed even though available to them. Defendants do not dispute that the information was not provided, or that the information would have been useful to Plaintiff in conducting the encounter with Lucero. Defendants' briefing can also be read as not contesting that the dispatchers were negligent in their handling of the call. The question for us boils down to whether the failure was caused by simple dispatcher error or by operational factors relating to dangerous conditions and/or policies and procedures that affect public users. If the former, *Archibeque* controls; if the latter, *Callaway*, *Castillo*, and *Encinias* control. Or does this case implicate *Upton* and the principle of cascading failures to follow procedures? We conclude that the errors alleged by Plaintiff are most appropriately deemed simple employee negligence for which Section 41-4-6 does not waive immunity.

**{33}** Plaintiff has not submitted any evidence that raises a question of fact as to any broad problems with how the VRECC was run. She has presented nothing, for example, to establish the inadequacy of the training provided to the dispatchers. Plaintiff also does not assert that the VRECC failed to maintain the physical plant and equipment appropriately. And, Plaintiff does not assert that the procedures and protocols in place for handling calls and dispatches were inadequate. Plaintiff does assert that the VRECC was understaffed at the time of this incident, but does not provide any evidence to create a fact question as to how, or even whether, the understaffing contributed to the errors committed that day. As described in the record, the dispatchers did not fully memorialize the information provided during the 911 call. This scenario is materially different from the one in *Upton* where the defendants first failed to follow the safety protocols in place for the student and thereafter repeatedly failed to follow safety protocols in place for all students suffering medical distress. The errors committed by the dispatchers do not rise to the level of the torrent of mistakes committed by the

school personnel in *Upton*. Plaintiff simply did not receive the information. Thus, Section 41-4-6 does not apply in these circumstances.

**CONCLUSION**

**{34}**   For the reasons stated above, we affirm the district court.

**{35}   IT IS SO ORDERED.**

**MICHAEL D. BUSTAMANTE, Judge,**
**retired, sitting by designation.**

**WE CONCUR:**

**ZACHARY A. IVES, Judge**

**KATHERINE A. WRAY, Judge**