This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-36350**

**J.V. and M.Q., on behalf of their minor child, C.V.,**

       Plaintiffs-Appellants,

v.

**WINSTON BROOKS, APS Superintendent; BRAD WINTER, APS Chief Operations Officer; STEVE TELLEZ, APS Chief of Police; Lieutenant KARL OVERMYER, APS Lieutenant; Lieutenant ALLAN S. RIDER, APS Lieutenant; and THOMAS LYON, APS Training Coordinator,**

       Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**C. Shannon Bacon, District Judge**

Kennedy Kennedy & Ives
Joseph P. Kennedy
Adam C. Flores
Albuquerque, NM

for Appellants

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Jennifer G. Anderson
Megan T. Muirhead
Elizabeth A. Martinez
Albuquerque, NM

for Appellees

**MEMORANDUM OPINION**

**HANISEE, Chief Judge.**

**{1}** Plaintiffs, J.V. and M.Q., on behalf of their minor child C.V., appeal from the district court's orders granting Defendants'[1] motion for summary judgment on Plaintiffs' claims of negligence, battery, and false imprisonment under the New Mexico Tort Claims Act (the TCA), NMSA 1978, §§ 41-4-1 to -30 (1976, as amended through 2019), thereby disposing of Plaintiffs' entire complaint. We affirm.

**BACKGROUND**

**{2}** This case arises from a November 2011 incident in which an APS resource officer[2] used handcuffs to restrain C.V., a seven-year-old special education student at Mary Ann Binford Elementary School (the School). Both the factual background and the procedural history of this case are pertinent to our analysis, and we summarize each below.

**I. Factual Background**

**{3}** After C.V. was deemed eligible for special educational services as both a "gifted" student and a student with autism, a Behavioral Intervention Plan (BIP) was created for him. C.V.'s BIP included a "Crisis Plan" which indicated that in an emergency situation or behavioral crisis, C.V.'s parents would be notified and the "Crisis Team" would be called. The BIP did not specify who was on the "Crisis Team," and, significantly, did not address the issue of physical restraint.

**{4}** On November 14, 2011, at approximately 10:30 a.m., an education assistant for C.V.'s classroom reported to Maria Martinez, an APS social worker, that C.V. was calling his peers "stupid" and refusing to do his classwork. C.V. agreed to go with Ms. Martinez to her office, where C.V. took off his shoes and threw them at Ms. Martinez. When C.V. refused to put his shoes back on and began grabbing other things to throw, Ms. Martinez contacted the School's administrative office for assistance. The Assistant Principal, Misti Miller, arrived and attempted to take charge of C.V. During this time, Ms. Martinez spoke with the School's principal, who instructed Ms. Martinez to call C.V.'s parents and ask them to come to the School to help control C.V.'s behavior. Ms. Martinez was initially unable to reach either of C.V.'s parents.

**{5}** While Ms. Martinez was trying to contact C.V.'s family, C.V. ran away from Ms. Miller. Concerned that C.V. would run off campus, thereby potentially endangering himself and/or others, Ms. Miller and Ms. Martinez searched for, found, and returned

1Defendants are, (1) former Albuquerque Public Schools (APS) Superintendent Winston Brooks, (2) APS Chief Operations Officer Brad Winter, (3) APS Chief of Police Steve Tellez, (4) APS Lieutenant Karl Overmyer, (5) APS Lieutenant Allan S. Rider, and (6) APS Training Coordinator Thomas Lyon.
2As explained at a hearing on Defendants' original motion for summary judgment, there are "different varieties" of school resource officers, including those employed and supervised by APS and others employed and supervised by the Albuquerque Police Department (APD). Defendants made clear that the resource officer in this case, Officer Xiomara Sanchez, was an APS employee.

C.V. to the School's office. C.V. ran away from Ms. Miller and Ms. Martinez several more times, and each time the two administrators found him and escorted him back to the office. Finally, C.V. again removed his shoes, threw them at the principal, ran around, locked himself in a bathroom, and eventually dashed into the cafeteria. Ms. Martinez followed C.V. into the cafeteria and asked if he was hungry, but C.V. sped away from her, hid under the tables, and began eating food from the floor. Only after Ms. Martinez gave C.V. something to eat and drink did he agree to put on his shoes and accompany her to a classroom.

{6}     As they left the cafeteria, Ms. Martinez and C.V. crossed paths with the principal and Officer Sanchez, who by then had arrived at the school having been dispatched there in response to a report regarding an "out of control" student. The principal and Ms. Miller had informed Officer Sanchez that a student had been running around the School causing problems since 10:30 a.m., and that the student's parents had been called but they were unable to be reached. There is no evidence in the record that any School administrator informed Officer Sanchez that C.V. was a special education student with a BIP in place.

{7}     Officer Sanchez called C.V.'s parents from the School office herself, speaking first to C.V.'s father who stated that he was unable to come to the School until after 2:30 p.m. because he was at the airport. Officer Sanchez then reached C.V.'s mother, identified herself as "school security," and informed C.V.'s mother that because C.V.'s behavior was out of control, he needed to be picked up from school. C.V.'s mother said she would come to the School to pick up C.V. and would arrive in approximately thirty minutes. Officer Sanchez then asked C.V.'s mother for permission to restrain C.V., and C.V.'s mother responded, "Yes." Although no evidence in the record suggests that C.V.'s mother understood Officer Sanchez was seeking permission to use handcuffs, there is likewise no evidence that C.V.'s mother asked Officer Sanchez to explain what she meant by use of the term "restrain."

{8}     Upon spotting the principal and Officer Sanchez as C.V. and Ms. Martinez left the cafeteria, C.V. once more ran away until staff, including Ms. Martinez, again corralled him, this time into a classroom. When Officer Sanchez walked into the classroom, C.V. began running around the room, pulling at a computer, trying to hit people and various objects in the classroom, knocking over trash cans and chairs, crawling under desks, pulling electrical plugs out of the wall, turning power strips on and off repeatedly, kicking Ms. Martinez, and hitting another School employee with a three-prong plug. Officer Sanchez eventually blocked the door to the classroom to prevent C.V. from running away again, so C.V. approached Officer Sanchez, pushed her, and then began to kick and hit her. Officer Sanchez warned C.V. that if he did not stop, she would place him in handcuffs.

{9}     C.V. then sat on the floor and continued to kick Officer Sanchez, eventually finding a rubber band, which he stretched and pointed towards her face. Officer Sanchez warned C.V. not to shoot the rubber band at her, but he did so anyway, eventually hitting her on his fourth attempt. Officer Sanchez warned C.V., for the second

time, that if he did not stop shooting rubber bands, she would put him in handcuffs. C.V. continued to shoot the rubber bands toward and resumed kicking Officer Sanchez.

**{10}** Approximately fifteen minutes after contending with C.V. in the classroom, Officer Sanchez escorted C.V. to a chair and placed him in handcuffs. Officer Sanchez double-locked the handcuffs to prevent them from tightening and ensured that there was approximately one inch of space between the handcuffs and C.V.'s wrist. C.V. pleaded with Officer Sanchez to take off the handcuffs, and Officer Sanchez responded that she would take them off when C.V. calmed down and stopped kicking. C.V. did not calm down; instead, he stood up in the chair several times, and dragged the chair with him while he pulled, tugged, and twisted in the handcuffs.

**{11}** Another resource officer arrived at the scene and saw C.V. struggling and kicking. This officer yelled at C.V. to stop, and eventually C.V. stopped struggling, sat down, and started crying. Shortly thereafter, C.V.'s mother entered the room and demanded Officer Sanchez remove the handcuffs, which Officer Sanchez did. C.V. spent approximately fifteen minutes in handcuffs. He had welts and scratches on his wrists from struggling against the handcuffs.

## II.  Procedural History

**{12}** Plaintiffs initially sued Officer Sanchez in state district court under 42 U.S.C. § 1983 (1996), alleging that handcuffing C.V. constituted unlawful seizure and excessive force under the Fourth Amendment. Officer Sanchez removed the case to federal court, which subsequently granted summary judgment in favor of Officer Sanchez on qualified immunity grounds.[3]

**{13}** Following the federal court's decision, Plaintiffs filed the present lawsuit, alleging that Defendants negligently operated a public building by creating a dangerous condition on the premises due to Defendants' failure to (1) effectuate or establish a policy or practice regarding the use of handcuffs on students with disabilities; and (2) train its personnel, including Officer Sanchez that students should not be handcuffed. Additionally, Plaintiffs argue Defendants' negligent training caused Officer Sanchez to commit battery upon and falsely imprison C.V. Officer Sanchez is not a named Defendant in this case.

**{14}** Defendants filed a motion for summary judgment as to all counts in Plaintiffs' complaint. The district court granted the motion, finding (1) no issue of material fact existed regarding Plaintiffs' claims that Defendants created a dangerous or unsafe condition; (2) the federal court's findings of fact in the federal action were binding on the present case as to Plaintiffs' claims of battery and false imprisonment based on

---

[3]In granting summary judgment, the federal district court focused exclusively on the second prong of the qualified immunity analysis and concluded that no "clearly established law put [Officer] Sanchez on notice that her actions violated C.V.'s Fourth Amendment rights to be free from unlawful seizure and excessive force." In granting summary judgment, the court also dismissed Plaintiff's additional claim for unlawful arrest, finding it to be unsupported factually and legally.

principles of claim preclusion; and (3) to the extent they were not, the district court would make the same findings of fact based on the record before it.

**{15}** Plaintiffs moved to reconsider the district court's grant of summary judgment, disputing the district court's adopted findings, arguing that principals of collateral estoppel were inapplicable, and contending that Plaintiffs' battery and false imprisonment claims should be heard by a jury because there were factual issues regarding the scope of C.V.'s mother's consent. The district court initially issued an order denying Plaintiffs' motion as it related to false imprisonment but granted the motion as it related to battery. In a preorder letter, the court explained that Plaintiffs' contentions regarding the scope of consent given by C.V.'s mother warranted reconsideration as to battery because while Officer Sanchez "had lawful authority to confine or restrain C.V.," a question of fact remained "as to the degree of the application of force used." Specifically, the district court concluded there was a disputed question of fact as to whether Officer Sanchez used excessive force with regard to Plaintiffs' claim of battery. Thus, the district court partially granted Plaintiffs' motion for reconsideration.

**{16}** Defendants filed their own motion for reconsideration, along with a second motion for summary judgment on Plaintiffs' remaining claim for battery. Following a hearing, the district court again granted summary judgment in favor of Defendants, this time in a written order that concluded that claim preclusion barred Plaintiffs' claim for battery. As well, the district court affirmed its prior ruling as to Plaintiffs' other claims. This appeal followed.

## DISCUSSION

**{17}** Plaintiffs argue the district court erred in granting summary judgment because (1) there were genuine issues of material fact regarding Plaintiffs' negligence claims under Section 41-4-6(A) of the TCA, and (2) collateral estoppel did not bar Plaintiffs' claims of battery and false imprisonment under Section 41-4-12 of the TCA. We disagree and explain.

## I.    Standard of Review

**{18}** It remains the case that generally, New Mexico courts view summary judgment with disfavor, preferring trials to disposition as a matter of law. *See Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 8, 148 N.M. 713, 242 P.3d 280. "On appeal from the grant of summary judgment, we ordinarily review the whole record in the light most favorable to the party opposing summary judgment to determine if there is any evidence that places a genuine issue of material fact in dispute. However, if no material issues of fact are in dispute and an appeal presents only a question of law, we apply de novo review and are not required to view the appeal in the light most favorable to the party opposing summary judgment." *City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146 (citations omitted).

## II. The District Court Properly Granted Defendants' Motion for Summary Judgment on Plaintiffs' Section 41-4-6 Claim

**{19}** Under the TCA, governmental entities acting within the scope of their duties are granted immunity from tort liability unless immunity is waived. Section 41-4-4. Plaintiffs asserted a claim under Section 41-4-6(A) of the TCA, which waives immunity "for damages resulting from bodily injury . . . caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building[.]" "The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building." *Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 9, 140 N.M. 205, 141 P.3d 1259. The "negligence of employees" can be attributed to negligent supervision or training, but such negligence alone cannot waive immunity under Section 41-4-6 unless directly tied to the operation or maintenance of a building. *See Upton*, 2006-NMSC-040, ¶ 16 ("Section 41-4-6 waives immunity for the operation or maintenance of a public building, which may include proof of negligent acts of employee supervision that is part of the operation of the building."); *see id.* ("[A] complaint alleging nothing more than negligent supervision is not actionable, because the TCA does not specify a tort waiver for negligent supervision."); *Espinoza v. Town of Taos*, 1995-NMSC-070, ¶ 14, 120 N.M. 680, 905 P.2d 718 (holding that inadequate supervision was not a dangerous "condition" of the playground for which sovereign immunity had been waived because there were no physical defects in the playground where the plaintiff was injured and the park itself was not being managed, operated, or maintained in an unsafe manner); *Leithead v. City of Santa Fe,* 1997-NMCA-041, ¶ 8, 123 N.M. 353, 940 P.2d 459 (stating that a claim involving negligent supervision only falls under the public building waiver if the supervision is directly tied to the "operation or maintenance" of the building, but "a claim of negligent supervision, standing alone, is not sufficient to bring a cause of action within the waiver of immunity created by Section 41-4-6"). "For the waiver to apply, the negligent 'operation or maintenance' must create a dangerous condition that threatens the general public or a class of users of the building." *Upton*, 2006-NMSC-040, ¶ 8.

**{20}** Plaintiffs argue there are genuine issues of material fact in dispute regarding Plaintiffs' Section 41-4-6 claims. Specifically, Plaintiffs contend that Defendants created a dangerous condition by (1) negligently failing to enforce—or alternatively, to enact—a policy to prevent elementary school students with disabilities from being handcuffed, and (2) negligently failing to train their subordinates, including Officer Sanchez, to refrain from handcuffing students in order to prevent battery and false imprisonment upon them.

**{21}** Regarding their first contention, Plaintiffs claim that APS failed to implement a policy or enforce adequate safety policies regarding the use of restraints on disabled elementary school students. The referenced "policy" was, in fact, a March 14, 2006 memorandum (the March 2006 Memorandum) from the State Director of Special Education regarding the use of physical restraint as a behavioral intervention for students with disabilities. The March 2006 Memorandum specifies that its contents are

*guidance* for the appropriate use of physical restraint for students with disabilities in districts and charter schools and provides, "[t]he use of physical restraint as a behavioral intervention for students with disabilities in public schools may be justified in certain instances[.]" Moreover, the March 2006 Memorandum explains that while the New Mexico Public Education Department (the Department) does not condone mechanical restraint of students, which would appear to include handcuffs, the Department recognized there may be certain instances where *manual* restraint of a student (or "therapeutic holding"), may be necessary and "that nothing in th[e] guidance would preclude a teacher or other staff member from using reasonable force to protect themselves, students, or other persons from assault or imminent, serious physical harm." Moreover, although the Department concluded the March 2006 Memorandum by stating that "[d]istricts and charter schools *should* develop policies and procedures outlining the use of physical restraint" and encouraged them to "adopt this guidance as a minimum to their local policy on the use of physical restraint[,]" nothing in the memorandum mandated that school districts, including APS, do so. Thus, any reliance on the March 2006 Memorandum by Plaintiffs to contend that Defendants failed to follow or train Officer Sanchez on an existing policy is unsupported and legally insufficient to constitute a genuine disputed issue of material fact.

{22}    Similarly, the March 2006 Memorandum fails to establish that APS or Defendants were under a duty to adopt such a policy and failed to do so. Although Plaintiffs argue Defendants had a duty to enact a policy expressly prohibiting the use of handcuffs on special education students, they have not pointed to any statute, regulation, or case requiring APS to have such written policies. *See Oakey v. May Maple Pharmacy, Inc.*, 2017-NMCA-054, ¶ 22, 399 P.3d 939 ("[T]he existence of a duty is a question of policy to be determined by the court as a matter of law with reference to legal precedent, statutes, and other principles comprising the law." (internal quotation marks and citation omitted)). As stated previously, "[w]e assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority. We therefore will not do this research for counsel." *In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329.[4] Rather, Plaintiffs merely assert that the need for a policy is essentially self-evident, and that Defendants' failure to enact one constitutes negligence. Particularly given the absence of cited authority for this proposition, we decline to overrule the district court in this regard. To do otherwise would be to substitute Plaintiffs' policy-making judgment for Defendants' and the law. As such, we conclude that no genuine disputed issue of material exists as to whether

---

[4] We note that this court has previously contemplated whether the lack of a written policy regarding safety protocols in New Mexico Public Schools could trigger liability and waive immunity under the TCA in *Kreutzer v. Aldo Leopold High Sch.*, 2018-NMCA-005, 409 P.3d 930. There, we suggested that the lack of a written safety policy did not waive immunity under the TCA, but ultimately declined to resolve the issue because it was not preserved. *See id.* ¶¶ 54-56 ("[The p]laintiffs' attempt to recast their claim as one for negligent failure to have written safety policies concerning supervision and security in the parking lot is unavailing. [The plaintiffs] cite no statute, regulation, or case requiring New Mexico Public Schools to have such written policies. And they offered no evidence that lack of a written policy (as distinct from the unwritten policy of staff supervision of the parking lot [the school] undisputedly had) itself created a dangerous condition in the parking lot.")

Defendants created a dangerous condition on the premises through a failure to effectuate or enact a policy regarding the use of handcuffs on students.

{23}    In this regard, we are also unpersuaded by Plaintiffs' primary reliance on *Upton* for the proposition that Defendants created a dangerous condition by failing to enact or enforce policies and procedures. 2006-NMSC-040. In *Upton*, a student who suffered from severe asthma died as a result of an asthma attack after a substitute teacher required her to participate in strenuous exercise during a physical education class. *See id.* ¶ 3. The student had an Individualized Education Plan (IEP), which specified agreed-upon limitations to her participation in physical activity and expressly directed school personnel to immediately contact medical providers in the event of an asthma attack. *Id.* ¶ 2. The parents of the student sued the school district for negligence, arguing that Section 41-4-6 waived liability. *Id.* ¶¶ 1-3. The parents' claim was based on allegations of negligent conduct by school personnel that created a dangerous condition on school premises for not only their daughter, but for all similarly situated students. *Id.* ¶ 10. The negligent conduct alleged in *Upton* included the substitute teacher's demand that the student participate in strenuous exercise, a clear departure from the student's IEP, as well as the school's failure to train the substitute teacher on the limitations set forth by the IEP and school personnel's failure to adequately respond to the student's medical needs once her asthma attack was triggered. *Id.* ¶¶ 10-11. Specifically, after learning that the student was experiencing an asthma attack, school personnel waited fifteen minutes to call 911, a delay in response that was directly adverse to the explicit instructions in her IEP. *Id.* ¶¶ 5, 11. Moreover, school personnel never administered CPR, and instead attempted to give the student inhaler treatment and placed her in a wheelchair, unmonitored and alone, in a hallway while school personnel waited for emergency services to arrive. *Id.* ¶¶ 4, 11. During this time, the student was not breathing properly and was turning blue, and evidence suggested that the student might have already been dead by the time the ambulance arrived. *Id.* ¶ 11.

{24}    The present case is dissimilar to *Upton* in that the crux of our Supreme Court's decision in *Upton* was that the defendants' *failure to follow* the procedures established for at-risk students put *all* similarly situated students at risk, thus creating a dangerous condition on the premises. *Id.* ¶ 24 ("The school's indifference towards [the plaintiffs' daughter's] special medical needs makes it more likely that all similarly situated students were at risk as well. . . . The school's failures, if proven, created a dangerous condition for all special-needs children, and with regard to emergency responsiveness, for every student at the school."). Here, in contrast, the district court found that "it is not disputed that the APS employees involved in the incident giving rise to the complaint followed C.V.'s IEP and BIP, and Plaintiffs have not pursued any claim related to a failure to adhere to the IEP and BIP." That finding is unchallenged on appeal. *See Stueber v. Pickard*, 1991-NMSC-082, ¶ 9, 112 N.M. 489, 816 P.2d 1111 (stating that unchallenged findings are binding on appeal). As well, to the extent that Plaintiffs argue that Defendants acted outside the scope of C.V.'s IEP and BIP, they acknowledge that C.V.'s behavior on November 14, 2011, was uncharacteristic for C.V. and also fell outside the scope of his BIP, even though his IEP identified that C.V. "can be very immature when redirected. He kicks, runs around the room, bites, destroys papers,

pencils, crayons. At this level, the only thing you can do is sit with him, calm him down, and work with him [one on one]." That a single student was behaving outside the scope of his expected behavior, as contemplated by his BIP, and a resource officer responded to the student's unprecedented behavior outside of the BIP, does not create the sort of dangerous condition to other students identified in *Upton*. Thus, *Upton* does not support Plaintiffs' argument in this regard.

**{25}** Rather, the response to C.V.'s misbehavior is akin to a discrete administrative act affecting only a single person, for which the TCA does not waive immunity. *See Archibeque v. Moya*, 1993-NMSC-079, ¶ 8, 116 N.M. 616, 866 P.2d 344 (explaining that immunity was not waived when a single individual was put at risk by one employee's negligent performance of an administrative function). Plaintiffs have not shown that Defendants had a duty to enact policies and procedures regarding the use of handcuffs, or that the lack of a written policy itself created a dangerous condition. As such, there is no evidence in the record that places in dispute a genuine issue of material fact regarding whether any negligent training or supervision by Defendants created a dangerous condition threatening *all students* of the School, as would be required to waive immunity under Section 41-4-6. *Upton*, 2006-NMSC-040, ¶ 8 ("For the waiver to apply, the negligent operation or maintenance must create a dangerous condition that threatens the general public or a class of users of the building." (internal quotation marks and citation omitted)).

**{26}** We note as well that Plaintiffs' argument here rests upon the assumption that training of subordinate employees by school officials would have definitively incorporated a ban on the use of handcuffs in this instance. We rejected that contention already, and do again now in the context of whatever training Plaintiffs contend should have resulted in a different response to C.V.'s uncharacteristic but lengthy behavioral episode. Stated simply, the vague declaration that training was warranted yet not administered is insufficient to warrant reversal of the district court on this basis. Accordingly, even in viewing the record in the light most favorable to Plaintiffs, we hold that the district court was correct to determine there to be no genuine issue of material fact regarding whether Officer Sanchez's actions could be a product of any negligence by Defendants that created a dangerous condition on the premises.

### III. The District Court Correctly Granted Defendants' Motion for Summary Judgment on Plaintiffs' Section 41-4-12 Claims

**{27}** Plaintiffs also appear to challenge the applicability of collateral estoppel because their state tort claims involve a different reasonableness standard than the federal case in which Officer Sanchez was a defendant. They argue that the federal court did not make a determination regarding any issues relevant to the present case because the state tort claims are distinct from the constitutional claims in the federal action. We note that while both parties briefed the issue of collateral estoppel, or *issue* preclusion, our review of the district court's order suggests that its decision was based on principles of res judicata, or *claim* preclusion. Specifically, in its order granting summary judgment on Plaintiffs' Section 41-4-12 claim, the district court wrote, "in light of Plaintiffs' position on

Defendants' motion, the [C]ourt concludes that Defendants have demonstrated that *claim* preclusion bars Plaintiffs' claim for battery." Despite this discrepancy between the district court order and the parties' briefing, however, and in light of our conclusions above pertaining to Plaintiffs' Section 41-4-6 claims, we need not explore this distinction because we conclude that on the record before us Plaintiffs' Section 41-4-12 claims fail as a matter of law. We explain.

**{28}** Under Section 41-4-12 of the TCA, immunity "does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, [or] false imprisonment . . . when caused by law enforcement officers while acting within the scope of their duties." More specifically, a waiver of immunity under Section 41-4-12 requires "that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law." *Wachocki v. Bernalillo Cty. Sheriff's Dep't*, 2010-NMCA-021, ¶ 23, 147 N.M. 720, 228 P.3d 504, *aff'd*, 2011-NMSC-039, ¶ 1, 150 N.M. 650, 265 P.3d 701 (internal quotation marks and citation omitted).[5] As Plaintiffs acknowledge, Officer Sanchez is not herself a Defendant, and given that Plaintiffs' earlier lawsuit against Officer Sanchez was dismissed by the federal court on qualified immunity grounds, Plaintiffs maintain that their current claims are not grounded in a theory of respondeat superior and correctly conceded that any claims against the current Defendants that rely on vicarious liability are properly dismissed on res judicata grounds. Instead, Plaintiffs assert that their Section 41-4-12 claims are premised upon Defendants' negligent training and supervision of Officer Sanchez, a claim we have recognized when a law enforcement officer causes "a subordinate law enforcement officer to commit a tort listed in Section 41-4-12." *Thompson v. City of Albuquerque*, 2017-NMCA-002, ¶ 10, 386 P.3d 1015, *aff'd*, 2017-NMSC-021, ¶ 19, 397 P.3d 1279 (internal quotation marks and citation omitted).

**{29}** There are only three theories by which law enforcement officers' immunity may be waived under Section 41-4-12: First, immunity may be waived if an officer him or herself directly commits one of the enumerated torts. Section 41-4-12. Second, immunity may be waived if an officer negligently or intentionally causes the commission of one of the enumerated torts to be committed by a third person. *Ortiz v. N.M. State Police*, 1991-NMCA-031, ¶ 10, 112 N.M. 249, 814 P.2d 117 ("[I]mmunity is waived when a law enforcement officer causes the commission of certain listed torts by a third person."). Third, and finally, a law enforcement officer's immunity may be waived if the officer's negligent training or supervision of a subordinate officer causes the subordinate

---

[5] Defendants argue on appeal that Plaintiffs have not presented evidence—beyond the professional titles of three of the six named Defendants—that Defendants are law enforcement officers under applicable statutory definition. For the purposes of the TCA, "law enforcement officer means a full-time salaried public employee of a governmental entity, or a certified part-time salaried police officer employed by a governmental entity, whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor." Section 41-4-3 (internal quotation marks omitted). Given our ruling today, in which we substantively resolve Plaintiffs' Section 41-4-12 claims, it is unnecessary that we otherwise resolve any question of Defendants' status as law enforcement officers status under the TCA.

officer to commit one of the enumerated torts. *Thompson*, 2017-NMCA-002, ¶ 10. Under the present facts, and because Officer Sanchez is not a named Defendant in this case, the only available theory for Plaintiffs' claims under Section 41-4-12 is the third, wherein a supervising law enforcement officer's negligent training or supervision results in a subordinate officer's commission of an enumerated tort. *See Thompson*, 2017-NMCA-002, ¶ 10.

**{30}** To this end, Plaintiffs again argue that Defendants failed to train Officer Sanchez on policies and procedures regarding the use of handcuffs on students, and that such failure caused Officer Sanchez to commit battery. Plaintiffs identify the negligent failure to train or supervise specifically as "negligently train[ing] Officer Sanchez and other APS employees by failing to prohibit handcuffing of" certain students, unequivocally characterizing such as the "sole theory of liability" against Defendants. After a careful review, we are unable to identify, and Plaintiffs have not pointed to, any separate basis for their Section 41-4-12 claim apart from their theory that Defendants had a duty to train Officer Sanchez to refrain from handcuffing students or some specific category thereof. Plaintiffs' Section 41-4-12 claims, then, are necessarily tethered to their Section 41-4-6 claims—that is, those claims predicated upon Defendants' alleged creation of a dangerous condition due to a lack of policy regarding handcuff usage—because Plaintiffs provide no other basis for their argument that Defendants failed to train Officer Sanchez, and that such failure led to the battery of C.V., beyond their contention that Defendants had a duty to enact or enforce policies regarding the use of handcuffs on students.

**{31}** We also note that at the hearing on Defendants' motion for reconsideration and summary judgment, although the parties had briefed the matter in terms of consent and collateral estoppel, Defendants argued that the Section 41-4-12 claim failed based on the district court's earlier, unchallenged findings that Defendants were not required to have a policy on the use of handcuffs, and that the March 2006 Memorandum did not support a claim for liability. Plaintiffs conceded, responding, "I think we don't have [a vicarious liability or otherwise distinct] claim, we've either abandoned that, or that is [properly dismissed under res judicata], because of our previous lawsuits against . . . Defendants." Plaintiffs went on to concede that "[I]f the court's finding was that, as a matter of law, Plaintiffs did not show the test of material facts that would go to a reasonable jury finding negligent training or negligent supervision of [Officer] Sanchez, and indeed we don't have it, we're done, because that would be the sole claim left." The district court adopted Plaintiffs' concession into the order granting summary judgment to Defendants on Plaintiffs' Section 41-4-12 claim.

**{32}** Our conclusion above that Defendants did not have a duty to enact or enforce a policy regarding the use of handcuffs, together with Plaintiffs' concessions to the district court, foreclose Plaintiffs' argument that Defendants failed to train Officer Sanchez because, simply put, Defendants had no duty to enact or enforce a policy regarding handcuffs, and thus Defendants had no duty to train a subordinate officer on such a policy. Insomuch as the applicable theory of liability under Section 41-4-12 requires an initial finding of a supervising law enforcement officer's negligent training or supervision

of a subordinate officer, and based on our conclusion above that Defendants did not have a duty to enact or enforce a policy, we conclude that Plaintiffs' battery and false imprisonment claims pursuant to Section 41-4-12 fail as a matter of law and affirm the district court's grant of summary judgment to Defendants.

**CONCLUSION**

**{33}** For the reasons set forth above, we affirm.

**{34}  IT IS SO ORDERED.**

**J. MILES HANISEE, Chief Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**MEGAN P. DUFFY, Judge**