The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:**

**Filing Date: October 10, 2024**

**NO. S-1-SC-39690**

**MAUREEN A. SANDERS, as**
**Personal Representative of the**
**ESTATE OF KATHERINE PAQUIN,**

> Plaintiff-Respondent,

v.

**NEW MEXICO CORRECTIONS**
**DEPARTMENT, GREGG MARCANTEL,**
**and CATHELEEN CATANACH,**

> Defendants-Petitioners.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Valerie A. Huling, District Judge**

Butt, Thornton & Baehr, P.C.
Agnes Fuentevilla Padilla
Rheba Rutkowski
Sarah L. Shore
Albuquerque, NM

for Petitioners

Ives & Flores, P.A.
Laura Schauer Ives
Adam C. Flores
Alyssa Quijano

Henry A. Jones
Martha E. Mulvany
Albuquerque, NM

for Respondent

**OPINION**

**BACON, Justice.**

**I.     INTRODUCTION**

{1}     The central questions before us concern the scope of the "building waiver," NMSA 1978, § 41-4-6(A) (1977),[1] and whether it applies to waive the immunity of New Mexico Corrections Department (the Department or NMCD) from suit for failure to exercise care to prevent the off-premises criminal conduct of a third party. Defendants-Petitioners NMCD[2] erroneously released inmate Christopher Blattner (Blattner) prior to the completion of his sentence. Approximately six months after his release, Blattner murdered Katherine Paquin (Paquin). Plaintiff-Respondent the Estate of Katherine Paquin (Plaintiff) filed suit claiming the Department negligently operated a public facility within the meaning of the building waiver provision of the New Mexico Tort Claims Act (TCA), NMSA 1978, §§ 41-4-1 to -27 (1976, as amended through 2020).

---

[1]Section 41-4-6(A) is commonly referred to by our case law as the "building waiver." References to the building waiver and Section 41-4-6(A) are used interchangeably throughout this opinion.

[2]Defendants-Petitioners here are NMCD, then-Secretary of NMCD Gregg Marcantel, and NMCD Bureau Chief of Records, Cathleen Catanach. For clarity, reference to NMCD should be read to include the two named Defendants.

{2}    The district court determined otherwise and granted the Department's motion for summary judgment, concluding that the building waiver did not extend to off-premises injuries. The Court of Appeals reversed, holding that an injury incurred as a result of negligent operation is not geographically limited within the waiver. *See Sanders v. N.M. Corrs. Dep't*, 2023-NMCA-030, ¶¶ 15-16, 528 P.3d 716.

{3}    We affirm the Court of Appeals, concluding the building waiver contains no geographical limitation. Further, we hold that the negligent release of prisoners, if sufficiently pleaded, may constitute operation of a building within the meaning of the building waiver.

## II.    BACKGROUND

{4}    Christopher Blattner began serving a seven-year sentence in 2009 at the Geo Group, Inc. (Geo Group)-operated Guadalupe County Correctional Facility stemming from two convictions for trafficking a controlled substance and possession with intent to distribute. Although Blattner was not scheduled for release until 2015, NMCD and Geo Group employees erroneously processed his release from the facility three years early and prior to the completion of his sentence. Following his release, Blattner sought out and murdered Paquin  Subsequently, Blattner was arrested and pleaded no contest to voluntary manslaughter.

2

**III.   PROCEDURAL HISTORY**

{5}     Plaintiff filed an amended complaint for damages for wrongful death pursuant to the TCA asserting three claims: negligent operation of a public facility, death caused by law enforcement officers, and loss of consortium. The amended complaint named as Defendants the Department, then-department-Secretary Gregg Marcantel, then-department-Deputy-Secretary Joe Booker, Bureau Chief of Records Cathleen Catanach, and private correctional facilities operator Geo Group.

{6}     All claims against Joe Booker and Geo Group were subsequently dismissed with prejudice. The loss of consortium claim was also dismissed.

{7}     At issue here is Plaintiff's claim for negligent operation of a public facility, which alleges the Department was negligent in failing to adequately maintain records to ensure inmates served the full duration of their sentences, thereby creating a danger to the public at large.[3] In response, the Department and NMCD filed a motion for summary judgment based on sovereign immunity arguing that Section 41-4-6 was inapplicable to waive immunity because the building waiver did not cover negligent performance of administrative functions. The district court granted

---

[3]The Court of Appeals affirmed the district court's grant of summary judgment as to the claim of Death Caused by Law Enforcement Officers, *Sanders*, 2023-NMCA-030, ¶¶ 27, 31, which Plaintiff has abandoned on appeal.

summary judgment in favor of NMCD alternatively concluding, as a matter of law, that the building waiver was inapplicable because Plaintiff's amended complaint did not allege that the wrongful death occurred on or adjacent to NMCD's facilities. In a split opinion, the Court of Appeals affirmed the district court's law enforcement waiver ruling and reversed as to the building waiver, discerning no basis to support a geographical limitation within the waiver. *Sanders*, 2023-NMCA-030, ¶¶ 15-16. The dissent disagreed with the majority and argued that case law illustrated a requirement of a "proximity-derived nexus[]" between the injury and the building at issue. *Id.* ¶ 37 (Hanisee, J., dissenting).

{8}    Here, the Department argues that the Court of Appeals' interpretation of the building waiver conflicts with our precedent and impermissibly expands the waiver's application contrary to legislative intent and public policy. The Department requests our resolution of this alleged conflict and urges us to hold, pursuant to *Archibeque v. Moya*, 1993-NMSC-079, 116 N.M. 616, 866 P.2d 344, that the Department's conduct constitutes negligent performance of an administrative function and therefore bars Plaintiff's building waiver claim.

{9}    Because the building waiver "has been the subject of considerable judicial attention since its enactment," our perennial interpretation of the waiver has, in turn, produced extensive and occasionally disparate holdings. *Gebler v. Valencia Reg'l*

4

*Emergency Commc'ns Ctr.*, 2023-NMCA-070, ¶ 15, 535 P.3d 763; *see also Bober v. N.M. State Fair*, 1991-NMSC-031, ¶¶ 1, 27, 111 N.M. 644, 808 P.2d 614 (explaining that the building waiver applies beyond a building's physical premises); *but see Archibeque*, 1993-NMSC-079, ¶ 8 (holding that the purpose of the building waiver is to impose liability for negligence in the operation and maintenance of the physical premises owned by the government). We, therefore, begin our discussion by examining the legislative intent underpinning the TCA and its enumerated exceptions—namely the building waiver—to discern the waiver's scope and application. *See Rutherford v. Chaves Cnty.*, 2003-NMSC-010, ¶ 11, 133 N.M. 756, 69 P.3d 1199 ("In interpreting the meaning of a statute, our primary purpose is to give effect to the Legislature's intent."). We then canvass New Mexico's building waiver jurisprudence to explain what led to our "retreat from th[e] narrow reading of the statute" that now permits Plaintiff to pursue her claim arising from failure of NMCD to exercise care to prevent an off-premises injury caused by a third party. *Gebler*, 2023-NMCA-070, ¶ 15. Next, we discuss why the Court of Appeals did not err in holding the building waiver does not contain a geographic limitation and that the injury was properly evaluated under a premises liability theory. Lastly, we explain why Plaintiff's claims are not barred by *Archibeque*.

## IV.  DISCUSSION

## A.  Standard of Review

{10}  "The standard of review for determining whether governmental immunity under the TCA bars a tort claim is a question of law which we review de novo." *Rutherford*, 2003-NMSC-010, ¶ 8.

## B.  The New Mexico Tort Claims Act

{11}  The TCA delineates the scope of governmental liability in tort. *See* § 41-4-2. The TCA embodies the dual public policies of limiting governmental liability while also ensuring fair compensation for those injured by the negligence of public employees owing a duty of reasonable care while acting in the scope of their employment. *See* § 41-4-2; *see also Cobos v. Doña Ana Cnty. Hous. Auth.*, ¶ 6, 1998-NMSC-049, 126 N.M. 418, 970 P.2d 1143 ("The [TCA] attempts to balance [the] two important but conflicting public policies."). Section 41-4-4(A) of the TCA effects government liability limits by conferring sovereign immunity to governmental entities unless immunity is waived by the exceptions enumerated in Sections 41-4-5 through 41-4-12.

{12}  The enactment of the TCA was a direct legislative response to the New Mexico Supreme Court's abolition of sovereign immunity in *Hicks v. State. See* 1975-NMSC-056, ¶ 12, 88 N.M. 588, 544 P.2d 1153, *superseded by statute as*

6

*recognized in Nash v. Bd. of Cnty. Comm'rs of Catron Cnty.*, 2021-NMSC-005, ¶ 21, 480 P.3d 842; *Brenneman v. Bd. of Regents of Univ. of N.M.*, 2004-NMCA-003, ¶¶ 1, 4-5, 135 N.M. 68, 84 P.3d 685. The act that emerged in the wake of *Hicks* reestablished sovereign immunity and dissolved "all judicially-created categories such as 'governmental' or 'proprietary' functions and 'discretionary' or 'ministerial' acts previously used to determine immunity or liability." Sections 41-4-4(A), 41-4-2(B). However, the Legislature also "recogniz[ed] the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." Section 41-4-2(A). The Legislature, therefore, created eight exceptions to that doctrine to permit civil actions against government entities through a limited waiver of sovereign immunity. *See* § 41-4-4. The exceptions serve as discrete limitations designed to expose the government to liability to the extent the exceptions permit. *See* § 41-4-4(A) (authorizing exceptions as enumerated in Sections 41-4-5 through 41-4-12).

**C.     Legislative Declaration**

{13}     The TCA's legislative declaration, § 41-4-2, provides useful insight into the Legislature's concerns in enacting the TCA and the relationship between the TCA and traditional tort law. Subsection (A) of the legislative declaration frames the competing considerations balanced by the Legislature:

7

The legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity. On the other hand, the legislature recognizes that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done. Consequently, it is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the [TCA] and in accordance with the principles established in that act.

{14} By its plain language, the TCA grants general immunity from tort liability, stating that the government "shall only be liable within the limitations of the [TCA]." Section 41-4-2(A). The legislative declaration highlights the distinction between liability for private parties and government entities, a distinction this Court has long recognized. *See Marrujo v. N.M. State Highway Transp. Dep't*, 1994-NMSC-116, ¶ 24, 118 N.M. 753, 887 P.2d 747 ("The legislature never intended government and private tortfeasors to receive identical treatment.").

{15} Ultimately, "the Legislature achieved [a] balance by waiving sovereign immunity with respect to specific people and places which, *in the performance of certain governmental functions*, give rise to traditional duties to the public." *Brenneman*, 2004-NMCA-003, ¶ 19 (emphasis added); *see also Cobos*, 1998-NMSC-049, ¶ 6 ("The Legislature's solution was to grant . . . general immunity from tort liability, but to waive that immunity in certain defined circumstances."). Thus,

8

the statutory waivers of sovereign immunity created by the Legislature define particular governmental functions, the performance of which, expose the government to tort liability. The waivers exhaustively include operation or maintenance of motor vehicles, aircraft, watercraft, buildings, machinery, equipment, furnishings, public parks, airports, public utilities, medical facilities, health care providers, highways and streets, and law enforcement officers. *See* §§ 41-4-5 to -12. Therefore, it is under these enumerated waivers alone that the government may be held liable in tort under the TCA.

{16}     Section 41-4-2(B) operationalizes the Legislature's intent to waive sovereign immunity in certain defined circumstances by imposing liability under "traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." We discern from the Legislature's language that governmental liability for the performance of its functions under the enumerated waivers is akin to a private citizen's liability in all spheres. *See Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 15, 310 P.3d 611 ("[T]he Legislature expressed an intent to waive . . . immunity in situations that would subject a private party to liability under our common law."); *see also Brenneman*, 2004-NMCA-003, ¶ 19. So, upon application of a waiver, our common law controls, and the government is

treated no differently than a private citizen for the purposes of evaluating tort liability. *See Encinias*, 2013-NMSC-045, ¶ 9.

{17} However, government liability under an applicable waiver is not without limitation. We recognize, as Section 41-4-2(B) advises, that "[d]etermination of the standard of care . . . should be made with the knowledge that each governmental entity has financial limitations within which it must exercise authorized power and discretion in determining the extent and nature of its activities." Section 41-4-2(B)'s instruction read in conjunction with Section 41-4-2(A)'s statement that "government should not have the duty to do everything that might be done" provides one such limiting principle to the waivers' scope and applicability.

{18} We read the legislative declaration as providing three such principles that guide our interpretation and application of the building waiver. We summarize these limiting principles as follows: (1) the scope of the waivers concerns the government performance of certain functions as enumerated by the waivers (2) liability is based on common law tort concepts, and (3) governmental entities' financial limitations are a necessary consideration of the scope of its duty. Bearing in mind these principles, we turn to a discussion of the scope of the building waiver.

## D.      The Building Waiver

{19}      The building waiver is a statutory waiver applied to claims involving the government's operation "of any building, public park, machinery, equipment or furnishings." Section 41-4-6(A). In addressing the Department's argument that the waiver does not apply to this case, we first consider how "operation" has been defined by our courts, appraise the current framework for analyzing building waiver claims, and discuss the impact of *Wittkowski*'s "security, custody, and classification" holding for *Archibeque*'s pronouncement that "performance of administrative functions" are categorically exempted by the waiver. We conclude our discussion by announcing an analytical framework for the building waiver that relies not on the definition of operation or common law exclusions, but rather one that facilitates the waiver's purpose to expose the government to liability for the performance of certain government functions. *See Brenneman*, 2004-NMCA-003, ¶ 19; Section 41-4-2(A).

{20}      When applying the statutory waivers of sovereign immunity, "we first determine the legislative intent in the enactment of the waiver." *Miller v. N.M. Dep't of Transp.*, 1987-NMSC-081, ¶ 5, 106 N.M. 253, 741 P.2d 1374 (internal quotation marks and citation omitted), *superseded by statute on other grounds as recognized by Martinez v. N.M. Dep't of Transp.*, 2013-NMSC-005, ¶ 14, 296 P.3d 468. We look initially to the waiver's plain language which "is the primary indicator of

legislative intent." *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (internal quotation marks and citation omitted). However, we do not look "only to a selective dictionary definition of words used in a statute, but also to the legislative intent underlying its enactment." *Miller*, 1987-NMSC-081, ¶ 7; *see also State ex. rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352 ("[C]ourts must exercise caution in applying the plain meaning rule. Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning.").

{21}     Recognizing "that exceptions to the TCA's general rule of immunity are strictly construed," *Kreutzer v. Aldo Leopold High Sch.*, 2018-NMCA-005, ¶ 51, 409 P.3d 930, we also "read [statutes] in a way that facilitates their operation and the achievement of their goals," *Rutherford*, 2003-NMSC-010, ¶ 24. *See Miller*, 1987-NMSC-081, ¶ 5; *see also Brenneman*, 2004-NMCA-003, ¶¶ 17-18 (noting that because some cases have called for a strict construction of the Act and others a broader interpretation, "the more useful cannon of construction [is one which]… give[s] effect to the Legislature's intent"). That is, we need not abridge liability where the Legislature has not expressed an intent to do so. *See Brenneman*, 2004-

NMCA-003, ¶ 18. Moreover, "[we] consistently have given a construction to the [TCA] that would effect its remedial intentions." *Miller*, 1987-NMSC-081, ¶ 5.

{22}    The building waiver, in relevant part, provides,

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings.

Section 41-4-6(A).

{23}    Like all TCA waivers, the building waiver contains standard language waiving tort liability. Additionally, five of the eight waivers use the word "operation" to describe the conduct in which a public employee must be engaged to invoke the waiver. *See* § 41-4-5 (operation or maintenance of any motor vehicles, aircraft, and watercraft); § 41-4-6 (operation or maintenance of any building); § 41-4-7 (operation of airports); § 41-4-8 (operation of public utilities); § 41-4-9 (operation of medical facilities). Only two waivers, Section 41-4-5 and Section 41-4-6, contain both the "operation" and "maintenance" terms. We glean that the inclusion of both terms facilitates the full meaning of the conduct associated with the words within the waivers; for example, "equipment" and "motor vehicles" are both operated and maintained. *See Rutherford*, 2003-NMSC-010, ¶ 17.

13

{24} Prior to the 1991 amendment of Section 41-4-11, the Legislature had not defined either "operation" or "maintenance." However, in response to this Court's opinion in *Miller*, as we discuss later, the Legislature sought to clarify its intent and narrowed the definition of maintenance, which limited the waiver's application under Section 41-4-11. Section 41-4-3(E)(1)("[C]onduct involved in the issuance of a permit, driver's license or other official authorization to use the roads or highways of the state in a particular manner.")

{25} Although not definitive, the 1991 amendment of Section 41-4-11 in response to *Miller* supports our inference that the Legislature can see and has seen fit to define terms to broaden or narrow application of the waiver. *See Rutherford*, 2003-NMSC-010, ¶ 21 ("[W]hen considering the definition of 'maintenance,' the Legislature chose not to limit the meaning of the term 'maintenance' to 'upkeep and repair.'"). There is no statutory definition of "operation," and, despite our extensive jurisprudence applying the building waiver, the Legislature has so far not undertaken to restrict its meaning as it did with "maintenance." We therefore presume that the Legislature intended that "operation" be given effect to address a myriad of situations to which the building waiver may apply. Our jurisprudence bears this out.

{26} Absent statutory language defining "operation," our courts have interpreted the term's meanings within the contexts of specific facts. *See Chee Owens v. Leavitts*

14

*Freight Serv., Inc.*, 1987-NMCA-037, ¶ 10, 106 N.M. 512, 745 P.2d 1165 (analyzing "operation" of a school bus within the meaning of Section 41-4-5); *see also Adams v. Japanese Car Care*, 1987-NMCA-113, ¶ 8, 106 N.M. 376, 743 P.2d 635 (holding that city inspection of a private sewer during initial construction does not constitute "operation"). On one hand, this manner of piecemeal interpretation has afforded courts greater flexibility in evaluating the waiver's application to specific contexts. Indeed, because the building waiver covers "the operation or maintenance of *any* building" (Section 41-4-6(A) (emphasis added)), the absence of a strict definition for "operation" has permitted courts to consider what constitutes "operation" unique to a particular building—for example, in the context of the "operation" of a prison.

{27}     On the other hand, lacking definition, our appellate courts have frequently resorted to defining "operation" by way of exclusion. That is, instead of saying what operation is, courts have often defined operation by what it is not. *See Gallegos v. Trujillo*, 1992-NMCA-090, ¶ 18, 114 N.M. 435, 839 P.2d 645 (explaining that "operation should not be extended to include funding decisions by a county" (internal quotation marks omitted)); *see also Martinez v. Kaune Corp.*, 1987-NMCA-131, ¶ 10, 106 N.M. 489, 745 P.2d 714 (stating that the operation or maintenance building waiver "provided by Section 41-4-6 cannot extend to the state's licensing or inspection of a dairy farm or food store").

15

{28}     In *Wittkowski v. State*, the Court of Appeals employed this method, rejecting the plaintiff's proffered construction of "operation" in the building waiver as inapplicably inclusive of "security, custody, and classification of inmates." 1985-NMCA-066, ¶ 17, 103 N.M. 526, 710 P.2d 93, *overruled on other grounds by Silva v. State*, 1987-NMSC-107, ¶ 15, 106 N.M. 472, 745 P.2d 380. Indeed, and as we discuss later herein, since the *Wittkowski* holding that "security, custody, and classification" were not embraced under the definition of "operation" pursuant to the building waiver, 1985-NMCA-066, ¶ 17, our courts have used this framework to interpret legislative intent underlying the building waiver. *See Archibeque*, 1993-NMSC-079, ¶ 8; *Martinez*, 1987-NMCA-131, ¶ 7; *Gebler*, 2023-NMCA-70, ¶ 17.

{29}     Our definition of "operation" is, consequently, an amalgamation of judicially created exclusions through which the building wavier is rendered inapplicable. Among those exclusions from waiver of immunity, in a nonexhaustive list, our appellate courts have held that inspection of foods and food processing, building design, and post-adoption placement do not constitute "operation" for the purpose of the Section 41-4-6 building waiver. *See Martinez*, 1987-NMCA-131, ¶ 10; *Callaway v. New Mexico Dep't of Corrs.*, 1994-NMCA-049, ¶ 14, 117 N.M. 637, 875 P.2d 393; *Young v. Van Duyne*, 2004-NMCA-074, ¶ 30, 135 N.M. 695, 92 P.3d 1269.

16

{30}    *Archibeque*, the case upon which the Department primarily relies, has played a significant role in narrowing the definition of "operation" by excluding "performance of administrative functions" from the building waiver's scope. 1993-NMSC-079, ¶ 8. Contrary to the Department's assertion that the Court of Appeals has expanded the building waiver's application, our attempts to define "operation" have tended to narrow rather than enlarge the building waiver's scope.

{31}    The Department asserts that *Archibeque* controls here, arguing the alleged negligent conduct involved "security, custody, and classification" and therefore "operation" should not be considered for purposes of the building waiver. *Id.* However, we have not yet meaningfully defined "security, custody, and classification;" words which conceivably encompass a broad category of conduct that, in the Department's view, is exempt under the building waiver. *Id.* Further, it is unclear whether "administrative function" encompasses an even broader category of conduct to which the building waiver may or may not apply, rendering a court's task difficult if not arbitrary.

{32}    Thus, as these cases demonstrate, the building waiver's scope has the potential to be narrowed or broadened depending, in part, on the definition assigned to "operation." This has given rise to prudential concerns where, if construed too broadly, the "exception . . . swallows the rule." *See Sanders*, 2023-NMCA-030, ¶ 34

17

(Hanisee, C.J., dissenting in part and concurring in part); *see also Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 33, 140 N.M. 205, 141 P.3d 1259, (Minzner, J., dissenting) ("The application or expansion of ['operation or maintenance'] does not help us understand the Legislature's intent."). Alternatively, construed too narrowly the definition becomes a rule and that rule a categorical bar contrary to the Legislature's intent to waive the government's liability under specified circumstances.

{33} Notwithstanding these definitional challenges, discerning the precise meaning of "operation" is not the exclusive means by which we "effect [the waiver's] remedial intentions," and indeed, we have counseled that "[s]tatutes are to be read in a way that facilitates their operation and the achievement of their goals." *Miller*, 1987-NMSC-081, ¶¶ 5, 8. In *Miller*, this Court held that "maintenance" in Section 41-4-11(A) included issuance of an oversize vehicle permit, reasoning that to facilitate the operation of the highway waiver statute, "maintenance of a highway . . . must be held to include more than physical care and upkeep of the roadway itself." *Id.* ¶¶ 8-9. Recognizing that the issuance of oversized vehicle permits had "bearing upon the proper 'maintenance' of a highway," we concluded that issuance fell within the scope of the Section 41-4-11 waiver provision. *Id.* ¶ 9.

{34} This approach in *Miller* circumvented the pitfalls of defining a single word by instead appealing to the waiver's function as a means of achieving the public safety goal of proper highway maintenance. *Id.* ¶ 8. Although the Legislature's 1991 amendment of Section 41-4-11 expressly repudiated *Miller*'s inclusion of permit issuance in Section 41-4-3(E)(1) (1991), the definition of "maintenance," *Miller*'s reasoning retains its force. *See Rutherford*, 2003-NMSC-010, ¶¶ 21, 24.

{35} Recognizing that the plain language of the building waiver has been variously applied and the meaning assigned to "operation" has been context-specific and fact-dependent, we adopt *Miller*'s reasoning and conclude the appropriate construction is one that "facilitates [the waiver's] operation and the achievement of [its] goals." *Miller*, 1987-NMSC-081, ¶ 8. With *Miller* in mind, we address the Department's arguments as to the scope of the building waiver and its applicability to the case at bar.

**1. The Court of Appeals did not err in concluding that the building waiver contains no geographical limitation**

{36} The Department does not argue the building waiver's inapplicability stems from the situs-of-injury nor from the lack of physical defect or dangerous condition on the building's premises. Nevertheless, the district court granted summary judgment determining Plaintiff's amended complaint did not allege facts sufficient to invoke the building waiver because the wrongful death did not occur on or

19

adjacent to NMCD's facilities. In so concluding, the district court neglected to discuss the Department's principal argument that negligent performance of administrative functions barred application of the building waiver.

{37} The Court of Appeals reversed the district court's building waiver ruling. *Sanders*, 2023-NMCA-030, ¶ 2. In reaching its conclusion, the Court of Appeals considered the narrow issue of whether, as a matter of law, the building waiver did not apply when the wrongful death did not occur on or adjacent to the prison facility, holding the waiver contained no such geographical limitation. *Id.* ¶¶ 12, 15. On that basis, the Court rejected the district court's ruling as error. *Id.* ¶ 20. Because we have determined no basis for such a geographical limitation in either the building waiver's plain language, legislative intent, or indeed our case law, we agree with the Court of Appeals majority that the district court erred in its grant of summary judgment.

{38} However, in light of the misapprehension of our case law and the assertion in the Court of Appeals minority opinion that "there must be some nexus between the defendant's property, an injured user thereof, and the off-premises location where the injury occurs," we undertake to firmly settle the question of the building waiver's geographical scope. *Id.* ¶ 36 (Hanisee, C.J., dissenting in part and concurring in part).

{39} One of the earliest cases interpreting the scope of the building waiver considered its application to facts similar to those before us in this case. In

20

*Wittkowski*, two state penitentiary inmates escaped and fled New Mexico, crossing into Colorado where they robbed a liquor store and shot Wittkowski. 1985-NMCA-066, ¶ 4. On appeal, the Court of Appeals considered whether the building waiver applied to an off-premises crime committed by a third party resulting from the alleged negligence of the corrections department. *Id.* ¶¶ 4-6. The *Wittkowski* Court concluded that because the injuries alleged "did not occur due to a physical defect in a building," the waiver was inapplicable. *Id.* ¶ 17.

{40} Later, in *Castillo v. Cnty. of Santa Fe*, we reconsidered *Wittkowski*'s narrow construction of building waiver. *See Castillo*, 1988-NMSC-037, ¶¶ 5-6, 107 N.M. 204, 755 P.2d 48. The specific factual inquiry in *Castillo* concerned "whether dogs roaming loose upon the common grounds of a government-operated residential complex" posed an unsafe condition as to invoke the building waiver. *Id.* ¶ 9 (citations omitted). We held the building waiver extended to waive immunity for injuries arising from "unsafe, dangerous, or defective condition[s] on property owned and operated by the government," thereby expanding beyond *Witkowski*'s physical defect language to encompass dangerous conditions on the land. *Id.* ¶¶ 3, 6, 10.

{41} Subsequently in *Bober*, this Court cemented its view that liability for creating or permitting unsafe conditions was not strictly "limited by the physical boundaries

21

of the land." 1991-NMSC-031, ¶¶ 1, 27. Unlike *Castillo*, in which the dangerous condition—although roving—was nevertheless held to be a condition within the physical boundaries of the land, in *Bober* the plaintiff alleged that state entities were liable for creating a dangerous condition in an adjoining area beyond the property's boundaries. *Id.* ¶ 1. The plaintiff was injured in a car accident near the State Fairgrounds when more than ten-thousand concertgoers exited the property in their vehicles, streaming into surrounding traffic, creating a dangerous condition. *Id.* ¶¶ 2, 18. This Court held that the State Fair's duty "extend[ed] outside the boundaries of the Fairground and into the city street." *Id.* ¶ 16.

{42} Further, in *Bober* we clarified that premises liability under a Section 41-4-6 analysis "is not limited to claims caused by injuries occurring on or off a certain 'premises.'" *Id.* ¶¶ 26-27. Rather, we instructed that "liability is predicated not only on 'maintenance' of a piece of publicly owned property . . . , but it also arises from the 'operation' of any such property." *Id.* In so holding, we expressly disavowed physical defect as a threshold question for the building waiver analysis. *Id.* ¶¶ 26-27; *see also Gebler*, 2023-NMCA-070, ¶ 15 ("The retreat from the narrow 'physical defect' view of Section 41-4-6 was completed in *Bober*." (citation omitted)).

{43} Because our cases make clear that the building waiver does apply to off-premises injuries and does not require a nexus between the dangerous condition and

a physical defect of a building, we conclude that the Court of Appeals majority correctly interpreted the building waiver consistent with our precedent. To the extent that *Bober*'s holding left open the question of whether the building waiver applies to injuries caused by dangerous conditions anywhere, here we firmly resolve that the building waiver extends to negligence occurring beyond the physical premises. *See Bober*, 1991-NMSC-031, ¶¶ 16, 27. Having concluded that Plaintiff's claims are not barred because the wrongful death did not occur on or adjacent to NMCD's premises, we turn to the Department's argument as to the proper evaluation of the building waiver.

**2.     The building waiver is properly evaluated under a premises liability theory**

{44}     According to the Department, the Court of Appeals erred by "conflat[ing] the § 41-4-6(A) waiver inquiry with the 'common law jurisprudence' of premises liability." In the Department's view, the analysis of Section 41-4-6 "is antecedent to consideration of the elements of premises liability." Thus, the Department contends that the Court of Appeals erroneously applied substantive tort law contrary to legislative intent and policy. *Sanders*, 2023-NMCA-030, ¶ 12. We therefore address whether the building waiver may be properly evaluated under a premises liability theory and conclude a premises liability theory is properly applied to building waiver claims.

23

{45} The government's "[l]iability . . . under the [TCA is] based upon the traditional tort concepts," § 41-4-2(B), and "so we infer that the waiver of liability in Section 41-4-6(A) incorporates the concepts of premises liability found in our case law." *Encinias*, 2013-NMSC-045, ¶ 9. In *Encinias* the Court examined the extent to which the failure to address a known dangerous condition can serve as a basis for the building waiver. *Id.* ¶ 18.

{46} Applying a premises liability analysis, the Court queried "whether the government exercised reasonable care to discover and prevent dangerous conditions." *Id.* ¶ 17. Relying in part on *Bober* and *Castillo*, the *Encinias* Court reasoned that because the adjacent property was known to accommodate dangerous conditions in the form of bouts of violence, the "school's failure to address a pattern of student violence . . . [was] *not* merely failure to supervise" but rather represented dangerous conditions for which the school was potentially liable. *Id.* ¶¶ 13-14, 18. Thus, the *Encinias* Court determined that the plaintiff had alleged sufficient facts to overcome summary judgment in the defendant's favor. *Id.* ¶¶ 13, 18 (acknowledging the assistant principal's statement that the area was a known 'hot zone' was sufficient to establish "a genuine issue of material fact regarding the presence of a dangerous condition" on the school premises).

24

{47} The building waiver extends to negligence arising from the failure to follow protocols and procedures that gives rise to a dangerous condition affecting the general public or a class of users of the premises. *Upton*, 2006-NMSC-040, ¶¶ 23-24. In *Upton*, a fourteen-year-old girl died following a severe asthma attack that occurred after she was required to participate in a physical education class despite her special medical needs of which the school had been made aware. *Id.* ¶ 1. The plaintiff parents sued the school district claiming the district's negligence created a dangerous condition for the child and other similarly situated students. *Id.* ¶¶ 10-11.

{48} The *Upton* Court reversed the grant of summary judgment in favor of the defendants, concluding that the school failed to follow procedures specific to children with special medical needs; the school failed to appropriately respond to the child's medical distress; and these failures presented a dangerous condition to a "particular class of people that use the building;" specifically, the school's cascade of failures "created a dangerous condition for all special-needs children." *Id.* ¶¶ 23-24; *see Gebler*, 2023-NMCA-070, ¶ 29. The Court's decision in *Upton* opened the door for claims alleging that government entities that engage in "an act of negligen[t] . . . operation" by failing to follow their own protocols and procedures may be subject to negligence claims under the building waiver. *Upton*, 2006-NMSC-040, ¶¶ 2, 14.

{49}     *Encinias* and *Upton* follow our long line of cases in which the building waiver was evaluated under a premises liability theory recognizing the Legislature's intent "to waive . . . immunity in situations that would subject a private party to liability under our common law." *Encinias*, 2013-NMSC-045, ¶ 15; *see also Leithead v. City of Santa Fe*, 1997-NMCA-041, ¶¶ 1, 15, 123 N.M. 353, 940 P.2d 459 ("Failure to provide [swimming pool safety] services . . . makes the premises unsafe giving rise to liability under Section 41-4-6."); *Espinoza v. Town of Taos*, 1995-NMSC-070, ¶ 12, 120 N.M. 680, 905 P.2d 718 (expanding "earlier interpretations that immunity was waived only for defects in buildings, . . . [to include] the grounds surrounding them"). We therefore agree with the Court of Appeals' observation that *Encinias* "collapses the distinction between the government's waiver of immunity under Section 41-4-6(A) and premises liability for private parties in general, subject only to limitations found in case law." *Sanders*, 2023-NMCA-030, ¶ 12.

{50}     However, our *accord* with the Court of Appeals does not entirely dispose of the issues raised by the Department. The Department argues that application of the waiver is a two-step process requiring a court to first determine, as a matter of law, the waiver's applicability and, second, evaluate the elements of premises liability. Although we are not persuaded that determining the waiver's applicability is antecedent to evaluating the waiver under common law premises liability, we

26

recognize that a preliminary inquiry is necessary to determine, first whether the government has a duty and second "where [a p]laintiff's action lies on the spectrum" of facts to which the waiver potentially applies. *Gebler*, 2023-NMCA-070, ¶ 16. The Court of Appeals in *Gebler* synthesized the following analysis:

> The[se] cases . . . teach that the "operations" aspect of Section 41-4-6 will apply when a factual scenario can be fairly deemed to include either—or both—of the following characteristics. First, an operational failure to respond to or discover conditions which can pose a danger to a class of persons involved in or affected by an activity on the property. *Castillo* and *Encinias* are examples of this type of scenario. Second, a failure to create and/or to implement reasonably appropriate safety policies and operational procedures to make public properties safe for the public who use them.

*Id.* ¶ 26.

{51} In our estimation, the categorical approach proposed by *Gebler* harmonizes the somewhat disparate holdings of our numerous building waiver cases by focusing lower courts' attention to the facts pleaded and whether those facts fall somewhere on the continuum of conduct embraced by the building waiver. Therefore, we adopt *Gebler*'s framework in our determination of whether the building waiver applies. That is, in assessing the building waiver's applicability to the facts pleaded we ask "where . . . action lies on the spectrum." *Id.* ¶ 16.

{52} Our evaluation of duty is a separate inquiry in which a court determines duty as a matter of law. *See Rodriguez v. Del Sol Shopping Ctr. Assocs., L.P.*, 2014-

27

NMSC-014, ¶ 24, 326 P.3d 465 ("Courts are not powerless to dismiss cases as a matter of law . . . [T]hese determinations are materially different than a no-duty or modified-duty analysis. The court must determine that no reasonable jury would find that the defendant breached the duty of ordinary care.").

{53}     In *Cobos*, the Court held that a duty imposed by statute, regulation, or contract, when consistent with the purpose of the building waiver, is within the waiver's ambit. *Cobos*, 1998-NMSC-049, ¶¶ 12, 19. The *Cobos* Court considered whether the building waiver extended to "operation and maintenance of a privately-owned building" in which low-income residents were housed. *Id.* ¶ 1. The Dona Ana County Housing Authority contracted with the owners of private dwellings to administer the Section 8 Existing Housing Program by paying rent on behalf of program participants in exchange for a certain degree of control to ensure the home was "'decent, safe, and sanitary.'" *Id.* ¶ 2 (citation omitted). Plaintiff, a resident, brought a wrongful death suit against the housing authority alleging breach of duty and negligent selection and inspection of the building after her daughter and grandchildren were killed in a fire at the home. *Id.* ¶¶ 2-4.

{54}     The trial court dismissed the suit on the basis that the Housing Authority was immune from suit under the TCA. *Id.* ¶ 4. This Court reversed the Court of Appeals and district court, concluding that property ownership did not define the scope of the

waiver and that the Municipal Housing Act (MHA) imposed duties on the public employees to operate and maintain public housing. *Id.* ¶¶ 8, 18.

{55}    Citing, among others, precedents in *Miller* and *Bober*, this Court analyzed whether the housing authority's duty arose from a source beyond duties imposed by ownership and the TCA. *Cobos*, 1998-NMSC-049, ¶¶ 10, 12 (remarking that "[a]s a question of duty, this case is in some ways much simpler than cases like *Bober*… because the harm to Plaintiff's family was undisputedly caused by a physical defect within the building" and as in *Miller*, "[o]ur appellate courts regularly look to statutes, regulations, and contracts as sources of duties of ordinary care imposed on public employees that may bring them within a Tort Claims Act waiver"). In particular, the *Cobos* Court surveyed duties of operation and maintenance imposed by statute, regulation, and contract, and determined that "statute, regulations, and a triangle of contracts imposed specific duties to operate and maintain Plaintiff's home with due care." *Id.* ¶¶ 10, 13. There, the state's Municipal Housing Law (MHL) required the county to provide an adequate standard of housing that was safe and sanitary. *Id.* ¶ 14. Additionally, the Court concluded that the Housing Authority's agreement to administer a Section 8 Housing program with the Department of Housing and Urban Development imposed duties to adhere to specific federal regulations in the administration of the housing program. *Id.*

29

{56} In evaluating the duties arising from the MHL, the Court in *Cobos* concluded that the duties imposed by the MHL "must fit within the legislative intent of the [TCA]." *Id.* ¶ 19 (clarifying that "the purpose of the agency's duty must be consistent with the purpose of the waiver in Section 41-4-6 [(1977)]"). On this basis, the Court reasoned that one purpose of the MHL was "to impose on the Authority duties of operating and maintaining safe housing." *Id.* Therefore, this Court held that "[t]he duties to operate and maintain imposed by the [MHA were] precisely the same as the Legislature's objective in the building waiver—to help ensure that the Authority employees administer housing projects with ordinary care" and that liability may be imposed under the building waiver when a statute, regulation, or contract is "consistent with the purpose of the waiver." *Id.*

{57} Guided by *Gebler* and *Cobos*, we hold the proper analysis of the building waiver proceeds as follows. As a threshold, courts determine duty as a matter of law. *See Rodriguez*, 2014-NMSC-014, ¶ 24. A court makes this determination by looking at the facts as alleged in the complaint. *See Bober*, 1991-NMSC-031, ¶ 4 & n.2. Recognizing the guidance is primarily applicable to courts at the summary judgment stage, we reiterate that "Section 41-4-6(A) incorporates the concepts of premises liability found in our case law," and the Legislature's instruction that "[l]iability . . .

30

under the [TCA is] based upon the traditional tort concepts," *Encinias*, 2013-NMSC-045, ¶ 9; Section 41-4-2(B).

{58} In the context of premises liability for the building waiver, the duty of ordinary care originates with the property but is not limited by geography or a physical defect on the property. *Id.* ¶ 10 (clarifying that "the waiver is not limited to injuries resulting from a physical defect on the premises"); *Bober*, 1991-NMSC-031, ¶ 12 ("[T]he location of the accident is not relevant to the question of duty." (internal quotation marks and citation omitted)). Further, a court may support its finding of duty by referencing any statutes, regulations, or contracts that impose a duty, provided that duty imposed is consistent with the purpose of the building waiver. *See Cobos*, 1998-NMSC-049, ¶¶ 12, 19.

{59} Once duty has been established, the categorical approach announced in *Gebler* should guide courts in assessing whether a genuine issue of material fact exists. *Gebler*, 2023-NMCA-070, ¶ 26. That is, courts should query whether the complaint alleges either or a combination of both "operational failure to respond to or discover conditions [that] can pose a danger to a class of persons involved" and "failure to create and/or implement reasonably appropriate safety policies and operational procedures." *Id.* If the complaint does not allege, and the proffered evidence does not support, that the alleged negligent conduct falls somewhere in the foregoing

31

spectrum of failures, summary judgment may be appropriate. If, however, the complaint's allegations and supporting evidence give rise to a genuine issue of material fact, summary judgment should be denied. *See Garcia-Montoya v. State Treasurer's Off.*, 2001-NMSC-003, ¶ 7, 130 N.M. 25, 16 P.3d 1084.

{60} We reiterate that nothing in this guidance precludes courts from inquiring into how "operation" should be defined within a given context, particularly where the facts presented pose a novel issue. However, by leveraging the approaches from both *Cobos* and *Gebler*, courts may avoid the definitional pitfalls of our earlier cases and give the building waiver its intended effect: to waive the government immunity under the appropriate circumstances. *See* § 41-4-2(A). Further, we reiterate that the following principles should guide a court's evaluation of the waiver's applicability: (1) the scope of the waivers concerns the government performance of certain functions as enumerated by the waivers (2) liability is based on common law tort concepts, and (3) governmental entities' financial limitations are a necessary consideration of the scope of its duty.

**3.    The Court of Appeals did not err in reversing summary judgment on the building waiver**

{61} The Department's argument that the Court of Appeals' analysis conflicts with our precedent and legislative intent is unpersuasive for two reasons. First, neither the Court of Appeals nor the cases it cites assert that a "defendant subject to [a claim

under] the TCA must prove that a plaintiff cannot establish all elements of the claim under tort law to prove that the TCA waiver . . . does not apply." The Department thereby mischaracterizes the Court of Appeals' analysis, which simply determined that the district court "improperly granted" Defendants' motion for summary judgment because that grant was based solely on a reading that Section 41-4-6(A) contains a geographical limitation. *Sanders*, 2023-NMCA-030, ¶ 20.

{62} The Court of Appeals, thus, correctly rejected the Department's argument to the contrary, explaining "our courts have treated the geographical location of the injury as a matter of foreseeability." *Id.* ¶ 16. The Court's analysis did not, as the Department contends, conflate common law jurisprudence with analysis of the waiver. Indeed, the Court of Appeals declined to analyze the building waiver's application to the facts of the case. *See id.* ¶ 19 (declining "to determine there was no breach of duty . . . as a matter of law" where the district court did not so analyze). Thus, the Department's argument that the Court of Appeals applied substantive tort law is without basis and, moreover, unavailing here since we have consistently applied the building waiver under a premises liability theory. *See Brenneman*, 2004-NMCA-003, ¶ 17 ("Insofar as it re-established sovereign immunity, the [TCA] was in derogation of the common law. But in its exceptions, the [TCA] restored the common law right to sue in those specific situations.").

{63} For this reason, we also reject the Department's argument that application of the immunity waiver is a two-step analysis wherein the Section 41-4-6(A) waiver analysis is antecedent to the analysis of common law negligence and, where a finding of exception to the immunity waiver would terminate the proceedings without consideration of the negligence claim. This construction of the building waiver is not supported by either legislative intent or by our case law. *See* Section 41-4-2(B) ("Liability for acts or omissions under the Tort Claims Act shall be based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty.").

{64} In sum, the Court of Appeals' analysis of the building waiver does not conflict with legislative intent and policy or our precedent. Thus, the Court of Appeals did not err in reversing the district court's grant of summary judgment on the building waiver.

**4.** ***Archibeque* does not bar Plaintiff's claims**

{65} The district court's opinion and order on the motion for summary judgment did not address the Department's *Archibeque* argument and, on appeal, the Court of Appeals similarly declined to consider whether *Archibeque* precluded application of the building waiver. *See Sanders*, 2023-NMCA-030, ¶¶ 21-22 (declining to affirm the Departments' *Archibeque* argument under the right-for-any-reason doctrine).

34

The Department revives this argument here, stating that "*Archibeque* remains the principal basis for [its] contention that Section 41-4-6(A) does not waive TCA immunity."

{66} Applying the broadened scope of the waiver announced in *Bober*, *Archibeque* addressed whether the building waiver applied to waive immunity for a state penitentiary employee whose alleged negligence resulted in the release of an inmate, Archibeque, into the general prison population with his known enemy and resulted in Archibeque being beaten by that known enemy. 1993-NMSC-079, ¶¶ 2-3. Under Archibeque's claim, the Court considered whether classification of an inmate constituted "operation" of a building within the meaning of the building waiver. *Id.* ¶ 8.

{67} Invoking *Wittkowski*'s language, the *Archibeque* Court held that "operation and maintenance of the penitentiary premises, as these terms are used in Section 41-4-6 [(1977)], does not include the security, custody, and classification of inmates." *Archibeque*, 1993-NMSC-079, ¶ 8 (internal quotation marks omitted). The Court reasoned that the penitentiary employee "was not operating and maintaining the prison's physical premises when she negligently classified Archibeque." *Id.* Therefore, we concluded that the employee "was performing an administrative function associated with the operation of the corrections system." *Id.*

{68}     Significantly, in *Archibeque* the Court expressed that "[t]he purpose of Section 41-4-6 [(1977)] is to ensure the general public's safety by requiring public employees to exercise reasonable care in maintaining and operating the *physical* premises owned and operated by the government." *Id.* (emphasis added) (citing *Castillo*, 1988-NMSC-037, ¶ 7). However, upon scrutiny, it is clear that the word "physical" before premises is an alteration of the original quoted language from *Castillo*.[4] Thus, for the first time our Court authored an exception within the building waiver for so-called "negligent performance of administrative functions," *Archibeque*, 1993-NMSC-079, ¶ 8, and the often-quoted "discrete administrative decision[s]," *id.* ¶ 17 (Ransom, J., specially concurring). Moreover, the *Archibeque* Court announced this exception without defining "administrative function" and by

---

[4]In *Castillo*, we stated "that the legislature intended to ensure the safety of the general public by imposing upon public employees a duty to exercise reasonable care in maintaining premises owned and operated by governmental entities." 1988-NMSC-037, ¶ 7.

relying on two Court of Appeals cases, *Wittkowski* and *Gallegos*,[5] for a proposition which neither case supports. *Archibeque*, 1993-NMSC-079, ¶ 8; *see Gallegos v. State*, 1987-NMCA-150, ¶ 1, 107 N.M. 349, 758 P.2d 299.

{69} The immaculately conceived "negligent performance of an administrative function" has, nevertheless, continued to bear progeny. *See Lymon v. Aramark Corp.*, 728 F.Supp.2d 1222, 1267-68 (D.N.M. 2010); *Espinoza*, 1995-NMSC-070, ¶ 12; *Kreutzer*, 2018-NMCA-005, ¶ 70.

{70} The Court of Appeals responded to *Archibeque*'s "negligent performance of administrative function" exception a year later in *Callaway*, 1994-NMCA-049. The factually similar *Callaway* concerned whether the building waiver applied where the defendant Department of Corrections was negligent in allowing known gang members to be released into the general prison population. *Id.* ¶ 13. Additionally,

---

[5]*Gallegos*, 1987-NMCA-150, did not consider negligent performance of an administrative function or contain any such similar language. Indeed, because the *Gallegos* Court was still beholden to the physical defect language in *Wittkowski*, application of the waiver instead turned on consideration of whether a mop wringer wielded by one inmate against another was "'machinery, equipment or furnishings'" within the meaning of the statute. *Gallegos*, 1987-NMCA-150, ¶ 8 ("[N]o claim is made that any physical defect existed with the mop wringer or that a defect caused plaintiff's injuries."). In the Court's brief treatment of the building waiver, it simply cautioned that to apply the waiver to the facts before the Court "would open the door to liability for virtually all claims involving buildings, equipment, machinery or furnishings." *Id. Wittkowski*'s reasoning was similarly succinct and did not address administrative functions. *Wittkowski*, 1985-NMCA-066, ¶ 17.

37

the plaintiff's claim alleged that the design of the recreation room and the fact that the items contained therein could be used as weapons contributed to the creation of a dangerous condition. *Id.* Acknowledging *Archibeque*'s holding that negligent classification was insufficient to invoke the building waiver, the *Callaway* Court distinguished *Archibeque* on its facts. *Id.* ¶¶ 18-19. The Court held the waiver applied, seizing on *Archibeque*'s language that "'a segment of the population at risk might justify waiver of immunity'" whereas risk to a single individual does not. *Id.* ¶ 18 (citation omitted).

{71}   The Court of Appeals in *Callaway* reasoned, unlike the circumstances in *Archibeque*, that the prison employees knew of the risk posed by the gang and, nevertheless, exposed the general prison population to the known danger. *Id.* ¶¶ 18-19. The Court's determination appears to have rested on the cumulative errors that the "[d]efendants knew or should have known that the roaming gang members with a known propensity for violence had access to potential weapons in the recreation area[ and] that such gang members created a dangerous condition on the premises, . . . and that the danger to other inmates was foreseeable." *Id.* ¶ 19.

{72}   In this case, the Court of Appeals' refusal to consider the Department's *Archibeque* argument was, in part, due to the Department's failure to address why *Callaway* and not *Archibeque* governs here. *Sanders*, 2023-NMCA-030, ¶ 26. We

38

decline to weigh whether *Callaway* or *Archibeque* controls here. Instead, our focus is on the narrow question before us: whether *Archibeque*'s negligent performance of an administrative function language bars Plaintiff's claim. We hold that it does not.

{73} When *Archibeque* announced that the building waiver did not apply to waive immunity for "negligent performance of administrative functions," it did so in reliance on two Court of Appeals cases which did not support that position, as we have just discussed. *See* 1993-NMSC-079, ¶ 8. Further, while *Archibeque* declares that "waiving immunity for negligent performance of administrative functions would be contrary to the plain language and intended purpose of the statute," it does not identify why this is so. *Id.* Instead, *Archibeque*'s reasoning is conclusory and further contributes to confusion and potential misapplication by leaving "administrative functions" undefined beyond holding that "security, custody, and classification" are administrative. *Id.*

{74} Thus, in our view, *Archibeque*'s holding that administrative functions are categorically excepted under the building waiver has ever-diminishing utility for our building waiver analysis, particularly in light of Section 41-4-2(B)'s abolition of "all judicially-created categories such as 'governmental' or 'proprietary' functions and 'discretionary' or 'ministerial' acts previously used to determine immunity or liability." Moreover, if, as the Department claims, there has been an expansion of

the building waiver contrary to legislative intent, the expansion occurred more than thirty years ago when *Archibeque* grafted the negligent administrative function exception to the building waiver. We now alter course and disavow *Archibeque*'s "negligent performance of an administrative function" and "discrete administrative decision" language. *Archibeque*'s surviving holding—that when negligence creates an unsafe condition for a single individual, the building waiver is inapplicable—is consistent with our cases holding that the dangerous condition must pose a risk to the general population or a class of persons. *See Gebler*, 2023-NMCA-070, ¶ 26.

{75}     Accordingly, we hold that *Archibeque* does not bar Plaintiff's claim pursuant to the building waiver, and we remand to the district court for further proceedings consistent with this opinion.

**V.     CONCLUSION**

{76}     For the foregoing reasons, we affirm the opinion of the Court of Appeals that reverses the district court's grant of summary judgment on the building waiver, and we remand to the district court for further proceedings consistent with this opinion.

{77}     **IT IS SO ORDERED.**

_____
**C. SHANNON BACON, Justice**

40

**WE CONCUR:**

_____

**DAVID K. THOMSON, Chief Justice**

_____

**RICHARD C. BOSSON, Justice, Retired**
**Sitting by designation**

_____

**BRYAN P. BIEDSCHEID, Judge**
**Sitting by designation**

_____

**JANE C. LEVY, Judge**
**Sitting by designation**